UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

JACKSON COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                      Plaintiff,

       vs.

BHP BILLITON LIMITED, BHP BILLITON
PLC, JAC NASSER, ANDREW
MACKENZIE, PETER BEAVEN and
GRAHAM KERR,

                  Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Jackson County Employees' Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by BHP Billiton Limited ("BHP Ltd.") and BHP Billiton Plc ("BHP Plc") (together, "BHP" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of all purchasers of the American Depositary Receipts (the "ADRs") of BHP between September 25, 2014 and November 30, 2015, inclusive (the "Class Period"), seeking to pursue remedies against BHP and certain of its current and former executive officers and/or directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act.

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the ADRs trade on the New York Stock Exchange ("NYSE"), which is located in this District.

4.      In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff, as set forth in the accompanying Certification incorporated by reference herein, purchased ADRs during the Class Period and has been damaged thereby.

6.      Defendant BHP describes itself as a leading global resources company and is among the world's top producers of major commodities, including iron ore, metallurgical and energy coal, conventional and unconventional oil and gas, copper, aluminum, manganese, uranium, nickel and silver.  The Company operates under a Dual Listed Company structure, with parent companies BHP Ltd. and BHP Plc operated as a single economic entity by a unified board and management team.  The economic and voting interests in BHP resulting from holding one BHP Ltd. share are equivalent to that resulting from holding one BHP Plc share.  Accordingly, holders of ADRs effectively have an interest in a single group that combines the assets, and is subject to the liabilities, of BHP Ltd. and BHP Plc.  Throughout the Class Period, the ADRs of BHP Ltd. and BHP Plc were listed on the NYSE under the ticker symbols "BHP" and "BBL," respectively, with SEC filings jointly issued on their behalf.  Each ADR represented two ordinary shares of BHP Ltd. or BHP Plc, as the case may be.  For the fiscal year ended June 30, 2015, BHP Ltd. and BHP Plc had outstanding 3,211,691,105 and 2,112,071,796 fully paid ordinary shares, respectively.

7.      Defendant Jac Nasser ("Nasser") has served as a director of BHP Ltd. and BHP Plc since June 2006 and as Chairman of their Board of Directors (the "Board") since March 31, 2010.

8.      Defendant Andrew Mackenzie ("Mackenzie") has served as Chief Executive Officer ("CEO") and as a member of the Group Management Committee of BHP Ltd. and BHP Plc since

May 10, 2013, and as a member of the Board since May 2013. He joined the Company in November 2008 as Chief Executive Non-Ferrous.

9.      Defendant Peter Beaven ("Beaven") has served as Chief Financial Officer ("CFO") and as a member of the Group Management Committee of BHP Ltd. and BHP Plc since October 2014. Previously, he was President of Copper, a position he held since May 2013. Before that, he served in various executive roles at the Company, including as President of Base Metals, President of Manganese, and Vice President and Chief Development Officer for Carbon Steel Materials.

10.      Defendant Graham Kerr ("Kerr") was CFO and a member of the Group Management Committee of BHP Ltd. and BHP Plc from November 2011 until October 1, 2014. He joined the Company in 1994 and, except for a two-year hiatus, served in various executive roles, including as President of Diamonds and Specialty Products. He serves as CEO and a director of South32 Limited ("South32"), a mining company spun out of BHP in May 2015.

11.      Defendants Nasser, Mackenzie, Beaven and Kerr are referred to as the "Individual Defendants" and, together with the Company, as "Defendants."

12.      Additionally, Samarco's executive officers are, and at all relevant times were, elected by Samarco's board.

## CLASS ACTION ALLEGATIONS

13.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the ADRs of BHP during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

- 3 -

14.    The members of the Class are so numerous that joinder is impracticable.  Throughout the Class Period, the Company's ADRs were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and is only ascertainable through discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BHP and/or its transfer agent, and may be notified of the pendency of this action by mail or other means, using a form of notice similar to that customarily used in securities class actions.

15.    Plaintiff's claims are typical of the claims of the members of the Class because all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

16.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

17.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented and/or omitted material facts about the business and operations of BHP; and

(c)    whether and to what extent the members of the Class have sustained damages, as well as the proper measure of damages.

18.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable and separate actions could result in inconsistent judgments.  Furthermore, because the damages suffered by individual

Class members may be relatively small, the expense and burden of individual litigation make it impossible or impracticable for members of the Class to individually redress the wrongs alleged. There will be no difficulty in managing or maintaining this action as a class action.

## BACKGROUND

19.     BHP is among the world's top producers of major commodities, including iron ore. In fact, during the Class Period, the Company characterized iron ore as a "key pillar of BHP," also calling it a major contributor to both production and earnings, as reflected in the October 27, 2014 presentation slide below:



20.     Samarco Mineração S.A. ("Samarco") is a company based in Brazil that owns and operates iron ore mines, iron ore processing facilities, and a port located in the Brazilian states of Minas Gerais and Espírito Santo.  Samarco is jointly owned by BHP and mining company Vale S.A. ("Vale"), each of which holds a 50% interest in Samarco.

21.     Given its ownership structure, Samarco is operated by an eight-member board of directors comprised of four representatives of each of BHP and Vale.  Specifically, during the Class

Period, the Samarco board consisted of four BHP executives (one of whom was a member of BHP's Group Management Committee), and four Vale executives.

22.     The Company owns a 50% interest in Samarco, which owns and operates iron ore mining facilities and a port in the Brazilian states of Minas Gerais and Espírito Santo.  Samarco's main product is iron ore pellets.  Extraction and beneficiation of iron ore are conducted at Samarco's Germano facilities, located in the municipalities of Mariana and Ouro Preto.  Conveyor systems are used to extract ore and transport it from the mines.  Ore beneficiation then occurs in concentrators, where crushing, milling, desliming and flotation processes produce iron concentrate.  Concentrate leaves the concentrators as slurry and is pumped through pipelines to pellet plants in Anchieta, where it is processed into pellets.  The iron ore pellets are then heat treated and stored in a stockpile yard before being shipped out of a Samarco-owned port in Anchieta.

23.     The waste materials resulting from extracting and processing iron ore from slurry are known as tailings and are transferred to large reservoirs, or tailings ponds, where they are kept.  Iron ore mining produces an enormous amount of waste that requires containment in these ponds, which are secured by dams.  Tailings dams are typically constructed in stages, with embankments raised as mine and waste output increases.  Because tailings may contain harmful elements used in mining and processing ore, it is exceedingly important to ensure that the tailings remain contained and do not contaminate the surrounding area and populace.  In fact, Samarco has acknowledged that its primary challenge is to safely dispose of the tailings resulting from iron ore processing at its sites in Brazil.

24.     To capitalize on the projected strong demand for iron ore from current and potential customers in Asia and the Middle East, Samarco expanded the production capacity at its facilities in 2014 by 37%, from approximately 22.2 million dry metric tons of iron ore pellets to approximately 30.5 million dry metric tons.  This dramatic increase in production increased the amount of tailings

resulting from processing iron ore-bearing materials, requiring Samarco to expand its tailings ponds, heighten the Santarém dam, and engage in construction to heighten the Fundão and Germano dams.

25.     Yet tailings ponds are a notoriously dangerous way to manage and store tailings, as compared to dry stacking or other methods which eliminate the persistent risk of tailings breaches or contamination.  In fact, a July 21, 2015 report, entitled "The Risk, Public Liability, & Economics of Tailings Storage Facility Failures," identified an alarming trend in catastrophic tailings dam failures resulting from increased mining and production, driven by, among other things: lower excavation and processing costs; the ability to process lower grades of material based on technological advances; and declining metal prices.  As the report cautioned:

> [M]any of the same features of modern mining that create economic feasibility in lower grades of ore also pose greater challenges for the management of mine waste and waste water. One of the manifestations of these challenges overall is a greater frequency of Very Serious tailings dam failures [*i.e.*, having a release of at least 1 million cubic meters, and/or a release that travelled 20 Km or more, and/or multiple deaths (generally $\geq 20$)] with significant levels of social and economic consequence, sometimes non remediable.

26.     Moreover, the Company received a report in October 2013, commissioned by Brazil's Environment Ministry and prepared by the Pristínio Institute (the "Pristínio Report"), which warned of design deficiencies associated with the Fundão dam and its planned expansion to accommodate the mine's increased production capacity.  The Pristínio Report, prepared in response to Samarco's request for the revalidation of its operating license for the Fundão dam, warned that the dam is dangerously close to an adjacent waste rock pile managed by Vale.  Specifically, the Pristínio Report warned that water draining from the rock pile – which must remain dry – could undermine the dam's structural integrity.  The Pristínio Report recommended close monitoring of the dam and Samarco's submission of an emergency contingency plan, given the proximity of the dam to the nearby village of Bento Rodrigues.

- 7 -

27.     On November 5, 2015, the Fundão tailings dam failed, causing the downstream Santarém water dam to overflow, flooding 60 million cubic meters of land, and decimating the indigenous town of Bento Rodrigues.  The tailings are believed to be contaminated with arsenic, lead, chromium and various other heavy metals.  Securities analysts expect Samarco to suspend its mining operations for several years, remediation costs are expected to far exceed $1 billion, Samarco has already been forced to pay hundreds of millions of dollars in fines to the Brazilian government, and BHP is subject to direct liability arising from the disaster.

28.     During the Class Period, Defendants made materially false and misleading statements concerning the Company's commitment to safety and implementation of safety and monitoring protocols.  Prior to and during the Class Period, Defendants knew or recklessly disregarded the precarious condition of the Fundão dam and Samarco's tailings facilities.  When the truth about the Company's operations was revealed in a series of public disclosures and reports shortly after the Samarco disaster, between November 5 and 30, 2015, the price of the ADRs significantly declined, harming investors.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS DURING THE CLASS PERIOD

29.     The Class Period begins on September 25, 2014.  On that date, BHP filed its annual report on Form 20-F for the fiscal year ended June 30, 2014 (the "2014 Form 20-F").  In the 2014 Form 20-F, the Company emphasized its focus on safety, representing, in pertinent part, as follows: "The safety and health of our people and of the broader communities in which we operate are central to the success of our organisation."

30.     In the Chairman's Review section of the 2014 Form 20-F, Nasser also emphasized the Company's focus on safety, stating, in pertinent part, as follows:

Against the backdrop of external and organisational change, we continue to be guided by Our BHP Billiton Charter, which defines our values. Our first Charter value is Sustainability and we maintain a relentless focus on the health and safety of our people and the communities in which we operate. This year, we reported a record low total recordable injury frequency and no fatalities at our operated assets during the period. While this is an encouraging result, our efforts to protect the health and safety of our people will be unrelenting.

31.      Likewise, in the Chief Executive Officer's Report section of the 2014 Form 20-F,

Mackenzie stated, in pertinent part, as follows:

While we are encouraged to have recorded a year without fatalities, we must never rest on past performance. We will continue to relentlessly identify and manage material health and safety risks to protect our people and communities.

32.      In describing its "values" in the 2014 Form 20-F, the Company further emphasized its

concentration on ensuring the safety of its mining operations, employees and the surrounding areas

in which it operates, representing, in pertinent part, as follows:

In pursuing our strategy through all stages of the economic and commodity cycles, we are guided by Our BHP Billiton Charter values of Sustainability, Integrity, Respect, Performance, Simplicity and Accountability.

Our overriding commitment is to ensuring the safety of our people, and respecting our environment and the communities in which we work. This commitment informs everything we do and influences every aspect of our work.

33.      Separately, the Company represented in the 2014 Form 20-F that its "approach to

sustainability reflects our priority to put health and safety first, be environmentally responsible and

provide support to our host communities."

34.      Further conveying the impression that it put safety above all else, the Company also

represented in the 2014 Form 20-F that it had "appropriate controls in place" to manage and

eliminate risks and crises. Specifically, under the heading "Health and safety," the Company stated,

in pertinent part, as follows:

We recognise that the health and safety of our people comes first. This is core to Our Charter and to every aspect of our business. Our people are key to our long-term

- 9 -

success and central to improving our HSEC [Health, Safety, Environment and Community] performance.

To understand, manage and, where possible, eliminate the risks in our business, we have appropriate controls in place and provide our people with appropriate training. While eliminating hazards through engineering or physical controls has a strong place in safety management, we understand it is only part of the solution.

Our operations are required to have systems in place to identify and effectively manage foreseeable crises and emergencies. This ensures our operations can deal with potential causalities, to limit harm and to safely return to full function as soon as possible.

Across our business, we undertake annual assessments to verify that critical controls are effective in managing each material risk. During FY2014, we maintained this focus, which included assessing whether the critical controls were being deployed as designed and to the standard required.

35.     And to convey the impression that the Company faithfully follows applicable law in the communities in which it operates, the Company represented, in pertinent part, as follows:

We operate in an industry where many of our activities are highly regulated by laws governing health, safety and the environment. We are committed to compliance with the laws and regulations of the countries in which we operate and, where applicable, to exceeding legal and other requirements which are less stringent than our own.

36.     Finally, the 2014 Form 20-F included certifications, signed by Mackenzie and Kerr, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  These certifications, dated September 25, 2014, provided, in pertinent part, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Companies.

37.     Thereafter, Defendants continued to represent that safety was a foremost concern for the Company, and, further, that the Company had effective safety monitoring and control processes. For example, in a speech delivered at BHP Plc's October 23, 2014 annual general meeting, a

transcription of which was filed as an attachment to Form 6-K with the SEC on October 24, 2014 (the "October 2014 Form 6-K"), Nasser stated, in pertinent part, as follows:

> Against a backdrop of external and organisational change, we continue to be guided by the BHP Billiton Charter, which defines our values.
>
> Our first Charter value is Sustainability. This means putting health and safety first, being environmentally responsible and supporting our communities.

38.     Nasser also represented that the Company had strong corporate governance and systems, which engender the "highest ethical standards, personal and corporate integrity and respect for others," as follows:

> I talked earlier about volatility and risk. Our foundation for corporate resilience is built on a clear set of values as defined in Our Charter. Strong corporate governance and systems underpin the way we conduct business. We strive to foster a culture that values and rewards the highest ethical standards, personal and corporate integrity and respect for others. There are very few companies that have prospered for more than 130 years.

39.     For his part, Mackenzie, who also spoke at the October 23, 2014 annual general meeting and whose speech was also transcribed and filed with the October 2014 Form 6-K, stated, in pertinent part, as follows:

> Let me start with safety. Sustainability, our first Charter value, dictates that health and safety always comes first. At all times, in all places, in everything we do. So everyone goes home safely, every day.
>
> Jac [Nasser] spoke of the improvement in safety performance that we made during the 2014 financial year. While we were encouraged by this result, recent events have again demonstrated that we can never rest on past performance. We were all deeply saddened by the fatal injury of one of our colleagues in Australia in September.
>
> Keeping our people safe and healthy, across all our operations, matters more to me than anything else.
>
> Sustainability also drives our focus on delivering enduring benefits to our environment and to our communities.

40.     Further, Mackenzie emphasized the Company's "access to many of the best resource basins in the world," which, he represented, "underpins our competitive advantage." As he stated: "By focusing on the core, we can go further and faster. We know these basins intimately and we will continue to develop them well."

41.     Subsequently, in an October 27, 2014 presentation, filed as an attachment to Form 6-K with the SEC on October 28, 2014, Mackenzie identified safety as a "key theme," representing: "Safety is paramount[.]" Separately, executive Mike Henry claimed that BHP's "culture underpins safe and productive operations," representing that "[s]afety and productivity are closely linked" and that "planned work helps drive safe and productive outcomes[.]" And Jimmy Wilson, President – Iron Ore, stated: "We value safe and sustainable operations above all else[.]"

42.     Defendants further represented that safety was a foremost concern for the Company in speeches delivered at BHP Ltd.'s November 20, 2014 annual general meeting, transcriptions of which were filed as attachments to Form 6-K with the SEC on November 21, 2014 (the "November 2014 Form 6-K"). Specifically, Nasser stated, in pertinent part, as follows:

> Against a backdrop of external and organisational change, we continue to be guided by the BHP Billiton Charter, which defines our values. Our first Charter value is Sustainability. This means putting health and safety first, being environmentally responsible and supporting our communities.

43.     For his part, Mackenzie also recognized the importance of safety to the Company's business, stating: "Let me start with safety. Sustainability, our first Charter value, dictates that health and safety always comes first. At all times, in all places, in everything we do. So everyone goes home safely, every day." Building on this theme, he also represented: "Keeping our people safe and healthy across all our operations matters more to me than anything else. Sustainability also drives our focus on delivering enduring benefits to our environment and to our communities."

44.     Shortly thereafter, in a November 23, 2014 BHP Plc investor briefing and Company update, Mackenzie represented: "Keeping our people and operations safe matters more to me and the team than anything else, because we view safety performance as a critical indicator of a business in control." He further stated: "Sustainability, our first charter value, is also a key consideration for all of our investment decisions."

45.     In turn, Dean Dalla Valle ("Dalla Valle"), President of Coal, also emphasized the Company's continued focus on safety, stating, in pertinent part, as follows:

> Continuous improvement in a health, safety, environmental and community performance is critical to the success of our business. While we are aggressively pursuing productivity improvement, our work is predicated on continuing to improve HSEC [Health, Safety, Environment and Community] performance.
>
> Our priorities are to continue improving safety by rapidly improving our ability to manage material risk.

46.     More specifically, Dalla Valle represented: "We have implemented detailed plans, which are lowering the risk across all of our sites. These are site-based; they're routinely measured and tested all the way up to Andrew [Mazckenzie]." He further related that the Company "lowered our labor costs by 23% last year and achieved a 29% increase in material moved per employee." Notwithstanding such increased productivity, he stated that the Company's "systems and processes" enabled internal monitoring and benchmarking, as follows: "All the improvements are facilitated by our systems and processes, which enable internal benchmarking across our operations."

47.     For his part, Beaven, CFO and former President of Copper, extensively discussed the Company's focus on sustainability and interest in preserving and fostering the local communities in which it operates, not least because the Company's business depends on operating licenses. Beaven stated, in pertinent part, as follows:

> We fundamentally believe that we need to be aligned with our communities. We need to be in line with our community, because we need a license to operate; and we

need that license to operate to run on a multiple decades' basis. I don't believe that as society changes then we should sit and hang back and wait and be pulled in the direction of that society.

48.    In a November 24, 2014 presentation, filed as an attachment to Form 6-K with the SEC on the same date, Mackenzie and other Company representatives made similar representations to those made in the October 27, 2014 and other presentations.  Again, Mackenzie identified safety as a "key theme," representing: "Safety is paramount[.]"  Likewise, Beaven identified as a "key theme" that the Company "value[s] safe and sustainable operations above all else[,]" adding that it "ha[s] a strong and stable safety performance record underpinned by our focused approach to managing material risks[.]"

49.    Mackenzie conveyed the same sentiment during the February 23 and 24, 2015 half-year investor earnings calls for BHP Ltd. and BHP Plc, respectively, variously stating: "[k]eeping our people and operations safe always comes first"; "the health and safety of our team must always come first, always"; "the health and safety of our people has to always come first"; and "although we are very pleased about these results, we achieve almost nothing if we don't achieve it safely and sustainably, first."  And during the February 23, 2015 call, William Morgan, an analyst at Intrinsic Investment Management, told Mackenzie that "shareholders care very much about safety . . . ."

50.    Yet as iron ore production continued to increase, Mackenzie confirmed during the February 24, 2015 call that "the pressure on the price is downward."  It was only a matter of time before the Company's focus on production exceeded its focus on safety and sustainability.

51.    On March 17, 2015, Mackenzie and Kerr also emphasized BHP's focus on safety during a presentation on the proposed demerger (or spinoff) of South32, a transaction by which BHP intended to simplify its business by contributing assets to the newly-formed mining company.  As

- 14 -

Kerr, then-BHP CFO and CEO-elect of South32, stated when acknowledging that many members of

South32's management team previously worked at BHP:

> The South32 senior management team brings with it extensive experience, with strong technical capabilities, and considerable in-country experience. Beyond its deep operational expertise, the team also brings the best of BHP Billiton's values and skills, including a strong commitment to health, safety and our communities.

52.     During the August 25, 2015 full-year earnings presentation for BHP Plc, Mackenzie

characterized the Company's "most important priority" as the "health and safety of our people." In

addressing the five fatalities that had occurred during the 2015 fiscal year, he further explained:

> The health and safety of our people must come first and so across BHP Billiton we've interacted with the whole workforce to reaffirm our commitment to their safety and wellbeing, and to insist any work that is unsafe must be stopped.
>
> It is vital that we all remain vigilant to make sure that all of our colleagues return home safely every day. Nothing matters more.

53.     Mackenzie also assured investors that BHP was increasing production and lowering

costs while maintaining a safe operating environment, representing, in pertinent part, as follows:

"We've built a strong track record over the last three years and delivered productivity gains of over

$10 billion and we'll continue to deliver lower and lower costs as we run our operations more and

more safely and more and more efficiently."

54.     On September 23, 2015, BHP filed its annual report on Form 20-F for the fiscal year

ended June 30, 2015 (the "2015 Form 20-F"), in which Defendants continued to emphasize the

Company's focus on safety. In the 2015 Form 20-F, for example, the Company again represented:

"The safety and health of our people and of the broader communities in which we operate are central

to the success of our organisation."

55.     Likewise, in the Chairman's Review section of the 2015 Form 20-F, Nasser stated:

"Your Directors and your management team are committed to a safe workplace." And in the Chief

Executive Officer's Report section, Mackenzie represented: "Safety is unquestionably my first priority, as it is for everyone at BHP Billiton. I am working with all the leaders of BHP Billiton and we have implemented a Company-wide program of engagement to make our workplaces safer than ever before."

56.      In the 2015 Form 20-F, the Company also reiterated many of the same statements regarding safety and legal compliance contained in the 2014 Form 20-F, including the following:

- Our overriding commitment is to ensuring the safety of our people, and respecting our environment and the communities in which we work. This commitment informs everything we do and influences every aspect of our work.

- The health, safety and wellbeing of our people are central to the success of our organisation. Regardless of where our people are located or the type of work they undertake, we strive to create a working environment that is free from occupational illness or injury. Identifying and managing fatal and material risk is a critical component of our management approach. By understanding and managing our risks, we provide greater protection for our people, communities and assets.

- The health and safety of our people and of the broader communities in which we operate is central to every aspect of our business.  Regardless of where our people are located, the area of the organisation in which they work, or the type of work they undertake, we strive to create an environment that is free from occupational harm.

- We operate in an industry where many of our activities are highly regulated by laws governing health, safety and the environment. We are committed to compliance with the laws and regulations of the countries in which we operate and, where applicable, to exceeding legal and other requirements which are less stringent than our own.

57.      Additionally, the Company represented that it had strengthened its evaluation and implementation of safety protocols, referencing a "Company-level safety intervention" implemented by the highest levels of management, as follows:

As part of our constant focus to eliminate fatal and other serious incidents, a Company-level safety intervention was initiated in FY2015. The safety intervention was launched across our business through a variety of methods, including

- 16 -

workshops, team talks and surveys. Feedback was presented at our senior leaders' meeting in July 2015, identifying the key controls, programs, systems, processes and tools currently in place that require improvement and Company-wide adoption through focused leadership.

58.     As the Company explained, the intervention followed four fatalities during on-site work activities and one fatality in an off-site transportation accident.  "Independent investigations were undertaken for each incident, with remedial action taken and findings from the investigations shared across the Group."

59.     Finally, the 2015 Form 20-F included Sarbanes-Oxley certifications signed by Mackenzie and Beaven and dated September 23, 2015.  These certifications provided, in part, that:

> (1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> (2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Companies.

60.     Subsequently, Defendants continued to represent that safety was a foremost concern for the Company.  For example, in a speech delivered at BHP Plc's October 22, 2015 annual general meeting, a transcription of which was filed as an attachment to Form 6-K with the SEC on the same date (the "October 2015 Form 6-K"), Nasser stated, in pertinent part, as follows

> Our Charter is the single most important guide to what we do and how we do it. Putting health and safety first is not only one of our Charter values, it is at the heart of everything we do.

61.     Furthermore, as a result of the five fatalities during the year (discussed in the 2015 Form 20-F), Nasser represented:  "All of us at BHP Billiton are redoubling our efforts to make sure our people return home fit and well. Nothing is more important than the safety of our people."

62.     Likewise, Mackenzie stated: "Health and safety are paramount to us."  And he also represented that the Company had increased its efforts to monitor and improve safety across all of its operations and in the communities in which it operates, describing these efforts as follows:

> We've engaged tens of thousands of our people across the Company in discussions to upgrade their health and safety leadership, to make their workplaces healthier and safer; free from fatalities, serious injuries and long term health effects, including mental health.

> We will eliminate health and safety risks wherever possible, and provide greater protection for our people and communities.

63.     At the same time, Mackenzie acknowledged that the Company had a "challenging" year as a result of decreased demand, increased supply and lower commodity prices, explaining: "Operationally, demand growth slowed and supply grew. This lowered commodity prices across the board."  Yet the iron ore business's increased efficiency purportedly resulted in a 31% decrease in unit costs, which "partly offset lower prices."

64.     On November 5, 2015, disaster struck.  Notwithstanding Defendants' repeated Class Period assurances that the Company operated its business and operations in a safe manner and had adequate monitoring systems in place to uncover and prevent catastrophic incidents, the Fundão dam burst, flooding the nearby town of Bento Rodrigues with 60 million cubic meters of mud and mine waste.  On that date and thereafter, the price of the ADRs for BHP Ltd. and BHP Plc declined in concert with the disclosure of news and analyst reports regarding the cause of the dam failure, the Company's failure to adhere to safety standards that Defendants emphasized during the Class Period, and BHP's potential liability and financial exposure for the dam failure.

65.     For example, between November 5 and 30, 2015, media outlets variously reported, among other things, that: (i) the Pristino Report had specifically warned BHP, Vale and others in October 2013 of the precarious condition of the Fundão dam, including the fact that its location in

close proximity to the extensive Vale rock pile could undermine the dam; (ii) Samarco's warning systems were not fully operable when the dam failed, which had catastrophic consequences; (iii) as a result of the disaster, operations at Samarco were immediately suspended and may be suspended for several years; and (iv) BHP and Vale could face direct liability in Brazil for remediation and other costs, as well as fines, penalties and civil lawsuits, associated with the safety failings and damage.

66.    In fact, on November 30, 2015, the Company disclosed that the Brazilian government intended to commence legal proceedings against Samarco, BHP and Vale to recover clean-up costs and damages.  As the Company confirmed, Brazil seeks to force these entities to establish a fund of approximately $5.2 billion, which would provide for environmental recovery and compensation over a period of 10 years.  Also on November 30, 2015, Brazilian President Dilma Rousseff blamed the disaster on the "irresponsible action of a company," adding: "We are severely punishing those responsible for this tragedy."  Accordingly, this disaster – which could have been prevented or otherwise mitigated, if proper safety precautions were taken and the Fundão dam were constructed in conformance with accepted industry practices – will continue to adversely affect BHP's business and operations for the foreseeable future.

67.    As these end-of-Class Period disclosures revealed, the Class Period representations above regarding the Company's focus on the health and safety of employees and the communities in which the Company operates, conducting its operations in a safe manner, and the environmental impact of its operations, were materially false and misleading when made because, among other things, Defendants knew or recklessly disregarded that: (i) increasing the production capacity of Samarco without appropriately fortifying tailings storage facilities posed a serious risk to the health and safety of employees and the surrounding community; (ii) the Pristino Report warned that the Fundão dam was at risk; that expanding the Fundão pond and dam, and/or mining operations in the

area, heightened the risk of a catastrophic failure at the Fundão dam; and that Samarco needed, but did not have, an emergency contingency plan to deal with a catastrophic incident; (iii) Samarco had not implemented an adequate monitoring or alert system for the Fundão dam; and (iv) the July 2015 report warned of the risk posed by tailings storage facilities of the kind used at Samarco.

68.     The Class Period representations above concerning the Company's safety, risk management and monitoring protocols and controls were also materially false and misleading when made because, among other things, Defendants knew or recklessly disregarded that: (i) Samarco did not adequately monitor the Fundão dam and had an insufficient monitoring system in place; (ii) Samarco did not have an effective alert system in place to warn employees and the surrounding community of an emergency; and (iii) as a consequence, BHP failed to implement proper safety, risk management and monitoring protocols and controls for its operations.

69.     Moreover, the Class Period representations above concerning the Company's compliance with laws and regulations in the countries in which it operated were false and misleading when made because, among other things, Defendants knew or recklessly disregarded that: (i) Samarco continued to operate and expand the Fundão tailings pond and dam in contravention of the recommendations and guidance set forth in the Pristíno Report; (ii) Samarco did not conduct its mining operations in compliance with local laws and regulations; (iii) Samarco's operations, which neither implemented nor complied with applicable safety standards, unacceptably placed at risk innumerable lives and the surrounding indigenous environment; and (iv) as a consequence, BHP's Samarco operations did not, in fact, comply with applicable laws and regulations in Brazil, but continuously operated in violation of them.

70.     Finally, the Sarbanes-Oxley certifications, which represented that the 2014 and 2015 Forms 20-F were accurate and complete "in all material respects," were materially false and

misleading when made because, among other things, Mackenzie, Kerr and Beaven knew and/or recklessly disregarded that the respective Forms 20-F they signed contained materially false and misleading statements and omissions.

71.     As a result of this news, the trading price of BHP Ltd.'s ADRs declined from $33.43 on November 4, 2015 (the day before the incident) to $26.68 on November 30, 2015 – a decline of more than 20%. The trading price of BHP Plc's ADRs declined similarly, falling from $32.84 on November 4, 2015 to $24.25 on November 30, 2015 – a decline of more than 26%. Further, during this period, the ADRs traded at high-than-normal volume.

## ADDITIONAL SCIENTER ALLEGATIONS

72.     As alleged herein, the Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

73.     The "Safe Harbor" warnings accompanying the Company's purportedly forward-looking statements during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false or misleading forward-looking statements because, at the time that each such statement was made, the speaker knew it was false or misleading or that it

- 21 -

was authorized and/or approved by an executive officer who knew it was false or misleading.  None

of the historic or present tense statements made by Defendants were assumptions underlying or

relating to any plan, projection or statement of future economic performance, or valuation, as they

were not stated to be such assumptions underlying or relating to any projection or statement of future

economic performance or valuation when made.  Nor were any projections or forecasts expressly

related to or stated to be dependent on historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

74.     Plaintiff and the Class are entitled to the fraud-on-the-market presumption of reliance

because, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The ADRs traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of the ADRs; and

(e)     Plaintiff and other members of the Class purchased the ADRs between the

time that Defendants misrepresented or failed to disclose material facts and the time that the true

facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.     At all relevant times, the market for the ADRs was efficient for the following reasons,

among others:

(a)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(b)     The Company regularly communicated with public investors via established

market communication mechanisms, including by regularly disseminating press releases on major

newswire services and through other means, including by communicating with the financial press, securities analysts, and other similar reporting services;

        (c)     The market reasonably digested new information as released, influencing the price of the ADRs;

        (d)     The Company was widely followed by securities analysts and the media, which reported on developments facing the Company and its operations; and

        (e)     The ADRs actively traded on the NYSE, an efficient market.

76.     Plaintiff and the Class are also entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because, as alleged above, Defendants omitted material facts during the Class Period in violation of a duty to disclose such information.

## LOSS CAUSATION/ECONOMIC LOSS

77.     During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the ADRs and operated as a fraud or deceit on ADR purchasers by misrepresenting the value of the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the ADRs declined, as the artificial inflation came out of the price.  As a result of their ADR purchases, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against all Defendants

78.     Plaintiff incorporates by reference the allegations above as if fully set forth herein.

79.     During the Class Period, Defendants disseminated or approved the false statements alleged above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the ADRs during the Class Period.

81.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the ADRs.  Plaintiff and the Class would not have purchased the ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

82.     Plaintiff incorporates by reference the allegations above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of securities of the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  Specifically, the Individual Defendants controlled the flow of information disseminated to the market and controlled the Company's operations.

84.     By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary securities law violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 24, 2016              ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       JOSEPH RUSSELLO
                                       MICHAEL G. CAPECI


                                       _/s/ Samuel H. Rudman_
                                       SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
jrussello@rgrdlaw.com
mcapeci@rgrdlaw.com

*Attorneys for Plaintiff*

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS MICHAUD
JACK TIMMONY
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com
jtimmony@vmtlaw.com

*Additional Attorneys for Plaintiff*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

JACKSON      COUNTY      EMPLOYEES'      RETIREMENT      SYSTEM
("Plaintiff") declares:

    1.    Plaintiff has reviewed a complaint and authorized its filing.

    2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

    3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

    4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

    5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

    6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

BHP

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2016.

JACKSON COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By:

Its:   Chairperson

- 2 -

BHP

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/28/2015 | 1,850 | $43.07 |