UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re BHP BILLITON LIMITED SECURITIES LITIGATION
----------------------------------------X
This Document Relates To:

ALL ACTIONS
----------------------------------------X

**MEMORANDUM AND ORDER**

16 Civ. 1445 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

These consolidated actions were brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against BHP Billiton Limited, BHP Billiton Plc (together, "BHP"), and certain of BHP's officers and directors (the "Individual Defendants", and, together with BHP, "defendants"), on behalf of a putative class of investors who purchased BHP American Depositary Receipts ("ADRs") between September 25, 2014 and November 30, 2015 (the "Class Period"). Defendants have moved to dismiss the Amended Complaint for failure to state a claim. For the following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

We summarize the allegations contained in the lengthy and detailed Amended Complaint. BHP operates under a dual listed company structure, with parent companies BHP Billiton Limited and BHP Billiton Plc operated as a single economic entity by a unified

board of directors and management team. Amended Compl. ("FAC") ¶ 26. Holders of the ADRs effectively have an interest in a single group that combines the assets, and is subject to the liabilities, of BHP Ltd. and BHP Plc. FAC ¶ 26. Throughout the Class Period, the ADRs of BHP Ltd. and BHP Plc were listed on the NYSE, with SEC filings jointly issued on their behalf. Id. BHP describes itself as a leading global resources company and is among the world's top producers of major commodities, including iron ore. Id.

This lawsuit arises out of the November 5, 2015 collapse of a massive iron ore tailings dam (the "Fundão dam") at an iron ore mining complex (the "Germano complex") in the Brazilian state of Minas Gerais. The Germano complex was owned and operated by a Samarco Minercão, S.A. ("Samarco"). Samarco, a Brazilian company, is a joint, 50-50 venture between BHP and Brazilian mining company Vale S.A. ("Vale"). FAC ¶¶ 53-54, 56. Tailings are wastewater that is a byproduct of mining and may contain harmful elements. See FAC ¶¶ 2, 67.

The collapse of the Fundão dam is widely regarded as the worst environmental disaster in Brazil's history. FAC ¶ 2. The dam was 30 stories high and contained enough tailings to fill 19 Dallas Cowboys stadiums. FAC ¶ 149. The collapse unleashed a flood of tailings that destroyed the nearby town of Bento Rodrigues, killed

19 people and injured many others, and wreaked property and environmental damage as it coursed through rivers, including the Rio Doce, and eventually spilled into the Atlantic Ocean, hundreds of miles away. FAC ¶¶ 2, 144-47. For example, the water supply of some 200 towns along the Rio Doce was contaminated, aquatic life and protected forests and habitat were destroyed, and the mudflow produced a cloud in the Atlantic Ocean visible from space, forcing cities in the Brazilian state of Espirito Santo to close down access to beaches. FAC ¶¶ 146-47.

The price of BHP's ADRs declined substantially on news of the dam collapse and suffered further declines as more information about the dam collapse came to light in the following weeks, including announcements by BHP relating to the incident, its projections for iron ore production, and financial impacts as a result of the incident; news reports of Brazilian law enforcement actions and civil lawsuits against Samarco, BHP, and their executives; and reports that dangerously high levels of toxic heavy metals were found in parts of the Rio Doce inundated by the tailings mudflow. FAC ¶¶ 293-313. For example:

- On February 22, 2016 BHP announced a pre-tax writedown of $1.2 billion relating to the dam collapse. FAC ¶ 167.[1]

[1] In their opposition, plaintiffs note that BHP revised this impairment charge upward to $2.2 billion on August 16, 2016. Opp. at 10.

- Shortly after the collapse, BHP and Vale announced the cessation of all mining operations at Samarco for at least the remainder of 2016. FAC ¶ 19.

- BHP, Vale, and Samarco reached a $5.2 billion settlement with Brazilian authorities in one of the enforcement actions against them (under which BHP and Vale would be jointly 50% liable for any amounts Samarco could not pay). FAC ¶ 172. However, the settlement was suspended on appeal, effectively reinstating that lawsuit. FAC ¶ 182.

- In February 2016, BHP announced that it was abandoning its “progressive dividend policy” (a policy of maintaining or increasing dividends over time) and cutting its first-half dividend by over 74%. FAC ¶ 168.

Moreover, Brazil’s Federal Prosecution Service has separately commenced proceedings against BHP, Vale, and Samarco seeking approximately $43 billion. FAC ¶ 174.

The Amended Complaint contains extensive allegations of structural problems with the Fundão dam dating back to 2009, as well as deficiencies with the emergency action plan (“EAP”) that Samarco had in place for the dam. These allegations draw on testimony given by Samarco employees and others who worked on the Fundão dam to Brazilian law enforcement as part of the latter’s investigations into the incident, statements made by these law enforcement officials, and news reports.

The FAC alleges that tailings dams are a notoriously dangerous way to manage and store tailings. Moreover, the Fundão dam was constructed using what is called the upstream method, as opposed

to the safer, more expensive downstream method. In the upstream method, the dam's height is increased over time by allowing the tailings closest to the dam to dry out, and then erecting a new embankment on top of them. The embankments are often made out of tailings themselves. The upstream method entails a higher risk of liquefaction, a physical phenomenon in which the strength and stiffness of soil are reduced by either dynamic forces (like an earthquake or other rapid loading) or static forces (such as slope instability or the buildup of water pressures unrelated to dynamic forces). The upstream method has been banned by some countries. See FAC ¶¶ 67-81.

In 2009, one of the Fundão dam's dikes experienced drainage problems, and Samarco's board of directors authorized a change in the dam's design. FAC ¶ 109. That same year, Samarco hired Randal Fonesca and a consulting company he owned to develop an EAP because an independent audit had concluded that the existing EAP did not conform to international rules of safety and was a "joke," in Fonesca's description. FAC ¶ 138. The Samarco Board rejected Fonesca's proposed EAP, which would have cost $1.5 million, because it was too expensive. FAC ¶ 140.

In 2010, a deformation or "piping" was observed in the dam's main gallery spillway, signifying that water draining from the dam

had caused an erosion of the foundation or embankment. FAC ¶ 110. In 2011, a similar problem occurred in the secondary gallery. FAC ¶ 111. A specialized company was brought in to examine the problem and proposed a solution involving reinforcing the galleries. Id. That solution was not implemented, however, because it would have limited the elevation that the dam could reach with tailings waste, reducing its capacity. Id. Instead, the galleries were plugged and deactivated, requiring a new overflow system to be built. Id.

Around the same time, Samarco wanted to expand the dam by extending it to a valley adjacent to a waste dump at a neighboring Vale mine. Pimenta de Avila, the dam's original designer and builder, explained in a September 2011 Technical Report for Samarco that, to safely expand the Fundão dam in the manner requested, the axis and geometry of the dam would have to be modified. He also expressed the concern that the proposed expansion would interfere with drainage at the adjacent Vale mine, and concluded that surface flows from the adjacent Vale waste dump could negatively impact the Fundão dam. FAC ¶ 112. Notwithstanding Pimenta de Avila's concerns, the expansion went forward and the axis and geometry of the Fundão dam were changed significantly, both to implement the requested expansion and to solve the ongoing drainage problems

plaguing the dam. FAC ¶ 113. By January 2014, the changes to the dam's geometry were complete. Id.

Beginning in early 2013, iron ore prices began to plummet, ultimately declining more than 70% by November 2015. To maintain profitability, BHP responded to this price drop by dramatically increasing production to record levels. Before the Class Period, Samarco approved a $3.5 billion expansion project called the P4P Project, with BHP and Vale each responsible for funding $1.75 billion. The P4P Project increased Samarco's iron ore pellet production capacity by nearly 37%, providing Samarco with the ability to ramp up iron ore pellet production beginning in late 2014. According to testimony by a Samarco environmental coordinator, production indeed increased by 30-40% in the last year before the dam's collapse, as a fourth plant was put into operation to convert the mined iron ore into iron ore pellets. However, the P4P Project included no plans for the construction of an additional dam. According to testimony provided by Germano Silva Lopes, the general manager of structure projects at Samarco, the Fundão dam was projected "to receive around 18 million cubic meters" of tailings waste in 2015, approximately 20% more than in the period between 2011 and 2014. See FAC ¶¶ 82-89.

In 2013, water upsurges were observed in the embankment near the dam’s left shoulder. FAC ¶ 117. In 2013, as the P4P Project was being implemented and production (and the corresponding tailings waste) was dramatically increasing, the decision was made to expand the Fundão dam rather than invest the capital necessary to build a new dam. In connection with the application to expand the Fundão dam and “revalidate” the license to operate it, the Minas Gerais State Prosecutor’s Office retained the Instituto Pristino, a not-for-profit environmental and geotechnical modelling institute affiliated with the University of Minas Gerais, to study the Fundão dam and prepare a report on its condition and whether the license should be renewed. FAC ¶ 122.

The Pristino Report warned of serious risks at the dam, and recommended that the license not be renewed unless certain conditions were met. For example, the report warned that the Fundão dam’s proximity to an adjacent Vale tailings pond posed serious risks that rising water levels, resulting from the natural flow of surface water, could cause several collapses in the Fundão dam’s walls, creating a massive flow of waste. The report concluded that the structures never should have been adjacent to each other because of their different physical characteristics. The report stated that these design defects had been noted in

previous technical reports, and should have been included in the application for renewal. Like Pimenta de Avila's 2011 Technical Report, the Pristino Report also recommended that studies on the possible impact of contact between the structures be undertaken. In addition, the Pristino Report recommended that the following conditions be placed on renewing the license: (i) more frequent (less than one year between tests) geotechnical and structural testing and monitoring of the Fundão dam and adjacent dikes; (ii) the creation and presentation of a contingency plan for hazards or accidents that might occur, including evidence of the effectiveness of the contingency plan; and (iii) performance of a break analysis of the Fundão dam, which was supposed to have been delivered to regulators six years earlier and which, the Pristino Report noted, was of "extreme importance to ensure the security and integrity of the environment." FAC ¶¶ 124-25.

Ultimately, these conditions were not imposed on the renewal of the license, and the recommended steps were not taken, causing the Minas Gerais State Prosecutor to abstain from voting to approve renewal of the license. Nonetheless, Supram, Minas Gerais's environmental regulator, renewed Samarco's license for the Fundão dam on October 29, 2013. FAC ¶ 126.

According to a Brazilian newspaper, Brazil's federal police uncovered messages from Samarco's internal communication system, including one on August 29, 2014, in which Samarco's Director of Operations, Kleber Luiz de Mendonca Terra ("Terra"), advised Samarco's CEO, Ricardo Vescovi de Aragão ("Vescovi"), that "some cracks in the massive where the course was deviated appeared at Fundão." FAC ¶ 121.

By September 2014, the P4P Project had been completed. That same month, Pimenta de Avila, acting as a part-time consultant to Samarco, performed six inspections of the Fundão dam and identified several serious risks. The most significant risk involved the beginning of a break in one of the Fundão dam's retreat dikes. Pimenta de Avila identified several extended cracks running parallel to the crest of the dike, as well as signs of movement at the foot of the slope. As he later testified, "the most relevant risk situation . . . on the September 4, 2014 visit" was "the beginning of a break in the retreat dike, evidenced by the occurrence of extended cracks parallel to the crest of this dike combined with signs of movement at the foot of the slope of this retreat[.]" He also identified liquefaction as a likely cause of these cracks, testifying further that "the geometry of the cracks characterized a vast area with movement typical of sliding which

very probably would have been caused by the occurrence of liquefaction involving foundation tailings from the retreat dikes[.]" FAC ¶ 118.

Pimenta de Avila informed Samarco executives of his belief that these cracks were the beginning of a rupture. According to his testimony, he made three recommendations to protect against liquefaction: (i) installing a buttress or reinforcements designed to take into account the likely liquefaction of the dike's foundation; (ii) installing piezometers along the wall at least ten meters below the foundation to monitor water pressure and saturation; and (iii) daily monitoring of the piezometers' readings and, if the readings indicated saturation in the foundation, drilling pumping wells to reduce the saturation level to guarantee the Fundão dam's stability. FAC ¶ 119.

Pimenta de Avila visited the Fundão dam again in December 2014 and recommended additional stability tests, using stricter safety coefficients. When he later inquired about the results of the recommended stability tests, he was told the results had been lost because the "computer's hard drive had burned up[.]" In response, he reemphasized the importance of performing the tests, and urged that the tests be made a priority. He testified that he "never received any feedback or request for clarifications about

his reports." He also testified that he reviewed the consulting reports prepared by the company responsible for the stability reports for the Fundão dam (a Brazilian company called VogBR) and "verified that his recommendations produced in 2014 were not considered by any consulting company." He further noted that "the results for the piezometers, the installation of which had been recommended in the retreat area, were not found in the reports produced by [the consultant], nor were these results and the risks inherent to them taken into consideration when preparing the document that attested to the stability of the Fundão dam[.]" FAC ¶ 120.

Former BHP employee and then Samarco employee Wagner Milagres Alves ("Alves") testified that one of the piezometers "continuously indicated an emergency situation in 2014 and 2015[.]" Alves further testified that the data from the piezometers was collected weekly, not daily as Pimenta de Avila urged as part of his recommendations made in connection with his September 4, 2014, review of the Fundão dam. FAC ¶ 135. According to a November 24, 2015 article in The Wall Street Journal, José Adércio Leite Sampaio, a Brazilian federal prosecutor, said that several of the 50 piezometers in the Fundão Dam's walls indicated

"emergency" levels of pressure and stress before the Fundão dam collapsed. FAC ¶ 134.

Plaintiffs allege that these warning signs, which accumulated over a number of years, were knowingly disregarded by Samarco and its co-owners, BHP and Vale – both of whom had representation on the Samarco Board, and which confirmed receipt of some of the most significant warnings, such as the Pristino Report. Samarco is operated by an eight-member board of directors comprised of four representatives of each of BHP and Vale (two active directors each and two alternate directors each). During the Class Period, the principal BHP executive on the Samarco Board was James Wilson ("Wilson"), BHP's President of Iron Ore and a member of BHP's Group Management Committee.[2] Wilson, who joined the Samarco Board in 2012, served as Chairman of the Samarco Board during 2014 and as Vice President of the Samarco Board during 2015. Serving as alternate directors for BHP during the Class Period were Margaret

[2] BHP's Group Management Committee is the primary executive leadership team for the Company. According to a March 18, 2014 letter to the SEC by BHP Head of Group Reporting Neil Beaumont, which was filed with the SEC on March 20, 2014 (the "3/18/14 Letter"), the Group Management Committee is BHP's chief operating decision maker and most senior executive body. According to the 3/18/14 Letter, the purpose of the Group Management Committee is to provide leadership to the Company, determining its priorities and the way it is to operate, thereby assisting BHP's CEO in pursuing the Company's corporate purpose. According to the 2014 Sustainability Report, the Group Management Committee "is a forum to debate high-level matters important to the Group and to ensure consistent development of the Group's strategy." The 3/18/14 Letter explains that the Group Management Committee is established by the CEO. During the Class Period, it was comprised of approximately twelve members, including defendants Mackenzie, Beaven, and Kerr, and Wilson. FAC ¶¶ 49-50.

Beck, BHP's Vice President of Finance for the Iron Ore business, and Sérgio Consoli Fernandes ("Fernandes"). Prior to the Class Period, BHP had two regular directors on the Samarco Board: Wilson and Marcus Randolph ("Randolph"), former BHP Chief Executive of Ferrous & Coal, who also served as a member of the Group Management Committee. Randolph served as Chairman of the Samarco Board in 2012 and as its Vice President during first half of 2013. Wilson replaced Randolph as Vice President of the Samarco Board for the remainder of 2013 upon Randolph's departure from BHP. FAC ¶¶ 57-59.

Concurrent with Wilson's promotion to the Group Management Committee, Randolph was replaced as a regular director on the Samarco Board by Jeffrey Mark Zweig ("Zweig") in April 2013. Zweig served as BHP's Vice President of Strategy and Development in the iron ore business from February 2012 to late 2014. Following Zweig's departure from BHP in late 2014, at least as of the Samarco Board's meeting on April 15, 2015, BHP did not replace him with another regular director, leaving Wilson as BHP's sole regular director on the Samarco Board during the bulk of the Class Period. FAC ¶ 60.

According to Samarco's Report of Management and Financial Statements, dated December 31, 2014, the Samarco Board has the

ultimate responsibility for directing and managing Samarco's business and mining activities. FAC ¶ 61. Samarco also had committees, including an Operations Committee and a P4P Project Management Committee, on which certain BHP executives, including Fernandes, served. FAC ¶ 62.

The Amended Complaint cites minutes from Samarco's board meetings concerning the Fundão dam and tailings storage, including the following:

- According to the August 8, 2012 minutes, the Board "reiterated the importance of the projects related to the tailings storage facilities, and it recommended that Samarco prioritize efforts to resettle the communities near the tailings dams." At that same meeting, the Board requested that Samarco's management "include specific plans for the tailings dams (covering the activities related to communities in the area)."

- According to the December 7, 2012 minutes, Terra, Samarco's Director of Operations, presented an overview of Samarco's tailings dams to the Board, including, among other topics, "dam management and risk control." In response to this presentation, the Board "stressed that the tailings facilities are critical (including continuous management/improvement of installations already in existence and needed expansions), and it recommended that Samarco maintain its focus on the design and implement of the tailings process as a matter of priority."

- According to the April 4, 2013 minutes, Terra provided an update on Samarco's tailings disposal plan and "stress[ed] the related risks and the mitigation actions[.]" In response to this update, the Samarco Board "stressed the importance of continuing with the studies on alternative tailings facilities[.]"

- According to the December 4, 2013 minutes, Terra presented "detailed information about the tailings disposal system[.]" In response to this presentation, the Samarco Board "acknowledged the progress made, stressing, however, that tailings are still a point of considerable concern, particularly regarding the future tailings storage capacity."

- According to the December 10, 2014 minutes, Samarco CEO Vescovi reported to the Samarco Board that the forecast for cumulative production of iron ore pellets had decreased by 10.7% compared to the budgeted amount for the year due to increased operating costs. In response to this report, the Samarco Board "challenged the executives to seek substantially better results in 2015, mainly considering the negative conditions forecast for the market in 2015, delivering the results promised in the budget is essential." At the same meeting, the Samarco Board stressed that, after safety, "cost reduction should be the main management focus in 2015." With respect to tailings dams, the Samarco Board reiterated "the concern over the risk related to the tailings disposal and sanitary landfill projects, and the impacts of the amounts of capital needed on the results of the company[.]"

- According to the April 15, 2015 minutes, the Board approved the execution of a project to raise the elevation of the Fundão dam immediately. The Board also approved an additional raise of the Fundão dam's elevation in August 2015 so long as the required environmental license was issued in the intervening period, as the Samarco Board expected would happen.

FAC ¶¶ 90-99.

In the afternoon of November 5, 2015, the Fundão dam began to leak, and then burst. Within minutes, Bento Rodrigues was overrun by the mudflow, which destroyed everything in its path. Because the EAP did not provide for a warning system or emergency training,

Samarco employees and Bento Rodrigues residents had little time to flee. FAC ¶ 47. In commenting on the collapse, a Bento Rodrigues resident, Paula Alves, and Duarte Junior, the mayor of the city that includes Bento Rodrigues, both said that the only silver lining was that the dam collapsed on a weekday afternoon, since if the incident had occurred at night, everyone in the village would have died. FAC ¶ 148.

In February 2016, two Samarco executives (its CEO and Director of Operations) were charged by Brazilian prosecutors with the equivalent of involuntary manslaughter in connection with the dam's collapse.[3]

Plaintiffs allege that BHP, its chairman (Jac Nasser), CEO (Andrew Mackenzie), CFO (Graham Kerr), and Kerr's successor as CFO (Peter Beaven), made various types of actionable misrepresentations and omissions relating to safety, BHP's financial performance, and the incident. Specifically, plaintiffs claim that defendants made actionable misstatements regarding (1) the Company's commitment to health and safety (¶¶ 196-241); (2)

[3] In their opposition brief, plaintiffs direct the Court to evidence (including an SEC filing by BHP) that, in October 2016, Brazilian prosecutors also charged numerous BHP executives with involuntary manslaughter. The charged executives include Wilson, Randolph, Zweig, and other BHP executives who served as BHP representatives on Samarco's board. Plaintiffs state that, if given the opportunity, they will seek to amend their complaint to add these and other allegations based on intervening developments. Opp. at 10, n.5.

the adequacy of the Company's safety, risk management, and monitoring protocols (¶¶ 242-53); (3) compliance with local laws and regulations (¶¶ 254-59); (4) Samarco's production capacity and projected performance (¶¶ 260-66); (5) the toxicity of the mudflow released by the dam's collapse (¶¶ 267-76); and (6) the status of the Company's progressive dividend policy (¶¶ 277-83). Plaintiffs further claim actionable omissions concerning uncertainties, risks, and risk factors (¶¶ 284-89), and that defendants signed and filed misleading certifications concerning the completeness of the Company's 2014 and 2015 Forms 20-F (¶¶ 290-92).

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). However, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In relevant part, Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it

> unlawful for any person . . . by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Halliburton Co. v. Erica P. John Fund, Inc., 134 S.

Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013)).

Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Moreover, plaintiffs must, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

Relatedly, "Fed. R. Civ. P. 9(b) requires that, whenever a complaint contains allegations of fraud, 'the circumstances constituting fraud . . . shall be stated with particularity.'" Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Id. (internal quotation marks omitted).

As noted above, plaintiffs here allege that defendants made both actionable misstatements and actionable omissions. Defendants' arguments for dismissal can be broken down into two broad categories: (1) arguments focused on the nature of the alleged misstatements and omissions (e.g., that plaintiffs have not adequately alleged falsity or materiality), and (2) arguments that plaintiffs have not adequately alleged scienter. We begin with the first category of arguments. We then consider defendants' scienter arguments. See infra II.

# I. Nature of Alleged Misstatements and Omissions

## A. Statements regarding the Company's commitment to health and safety (¶¶ 196-241) and the adequacy of the Company's safety, risk management, and monitoring protocols (¶¶ 242-53)

The Amended Complaint alleges that defendants made false or misleading statements about BHP's commitment to health and safety and the adequacy of the Company's safety, risk management, and monitoring protocols. Similarly, plaintiffs argue that defendants omitted to disclose facts needed to make these statements not misleading. Plaintiffs claim that defendants should have made disclosures about "the issues that afflicted the Fundão dam" and "the precarious condition of Samarco's operations," including the dam's design defects and structural problems, and lack of a viable

EAP and adequate monitoring systems. See, e.g., FAC ¶¶ 205, 207, 284-89.

Defendants primarily argue that the statements in these categories are too general to be actionable. Defendants also argue that some of these statements contain undisputed facts not adequately alleged to be false or misleading. Regarding plaintiff's omission-based theories, defendants argue that the specific risks that plaintiff claim were omitted appear material only in hindsight, and were well known to the market, including through BHP's own risk disclosures.

"A fact 'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)). "That is to say 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id. (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances. Because materiality is a mixed question of law and

fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (citations and internal quotation marks omitted).

"To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 185 (2d Cir. 2014). "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" Id. (quoting ECA, 553 F.3d at 206).

At the same time, consistent with the principle that assessing materiality is a "fact-specific inquiry," ECA, 553 F.3d at 197, courts have recognized that "[w]hether a representation is 'mere

puffery' depends, in part, on the context in which it is made." In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). While certain statements, "viewed in isolation, may be mere puffery," when the statements are "made repeatedly in an effort to reassure the investing public" about matters particularly important to the company and investors, those statements may become material to investors. Id.; Richman v. Goldman Sachs Grp., Inc., 868 F. Supp. 2d 261, 279 (S.D.N.Y. 2012) ("repeated assertions" were not mere puffery); see also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd., 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012); In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010). Moreover, while Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks omitted).

Applying these principles and considering defendants' alleged misstatements regarding safety in the context of the totality of plaintiffs' allegations, we conclude that plaintiffs have adequately alleged that certain of these statements were

materially false or misleading and that defendants omitted material facts necessary to make these statements not misleading. In reaching this conclusion, we note first that the statements that we identify as having been adequately alleged to be material are not mere generalities, but contain quite specific representations or guarantees of "some concrete fact or outcome."[4] Pontiac, 752 F.3d at 185. We also note that safety was obviously a major concern to BHP and investors, as indicated by defendants' extensive, frequent, and prominent discussions of the topic in their disclosures to investors. Indeed, in its own disclosures, BHP acknowledged that the level of safety of its operations -- and of its tailings dams specifically -- constituted material factual matter, as it disclosed that "Safety, health, environmental and community impacts, incidents or accidents . . . may adversely affect our people, operations and reputation or license to operate," and that "[e]nvironmental incidents," including

[4] See, e.g., FAC ¶ 242 ("Our operations are required to have systems in place to identify and effectively manage foreseeable crises and emergencies. This ensures our operations can deal with potential causalities, to limit harm and to safely return to full function as soon as possible. Across our business, we undertake annual assessments to verify that critical controls are effective in managing each material risk."), 227 ("The health and safety of our people must come first and so across BHP Billiton we've interacted with the whole workforce to reaffirm our commitment to their safety and wellbeing, and to insist any work that is unsafe must be stopped."). We find such statements significantly more specific than the safety-related statements held to be puffery in a parallel lawsuit brought by investors under 10b-5 against Vale relating to the collapse of the Fundão dam. See In re Vale S.A. Sec. Litig., No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017).

"uncontrolled tailings containment breaches," "have the potential to lead to material adverse impacts on our operations." Decl. of Karen Patton Seymour in Support of Defs.' Mot. ("Seymour Decl."), Ex. B at 29 (BHP 2014 Form 20-F), Ex. C at 29 (2015 Form 20-F).

Moreover, even if some of the statements are general enough that, had they been made in isolation, they might not be actionable, we cannot ignore the fact that defendants allegedly made these representations about BHP's commitment to safety over and over and over. Indeed, by defendants' own count, the FAC alleges 25 such misstatements during the Class Period, see Defs.' Opening Br. 13. By touting its commitment to safety to such a degree, BHP put the topic "at issue" such that we cannot say that, as a matter of law, investors would not find these representations material. Richman, 868 F. Supp. 2d at 278.

Accordingly, we find that the following paragraphs of the FAC contain statements that are sufficiently specific to be potentially actionable: ¶¶ 199 ("[W]e maintain a relentless focus on the health and safety of our people and the communities in which we operate. This year, we reported a record low total recordable injury frequency and no fatalities at our operated assets during the period. While this is an encouraging result, our efforts to protect the health and safety of our people will be unrelenting."),

200 ("We will continue to relentlessly identify and manage material health and safety risks to protect our people and communities.") 201 ("Our overriding commitment is to ensuring the safety of our people, and respecting our environment and the communities in which we work. This commitment informs everything we do and influences every aspect of our work."), 210, 217, 218, 222, 227, 233, 242. The statements in the remaining paragraphs of Sections VII.A and VII.B of the FAC are simply too general and/or aspirational to be actionable,[5] and accordingly plaintiff's claims based on those statements are dismissed.

Plaintiffs also allege that these statements were misleading because defendants failed to disclose facts about risks specific to Fundão and Samarco that needed to be disclosed to make these statements not misleading. Defendants argue first that the alleged omitted risks were material only in hindsight. We reject this contention.

The detailed and well-sourced Amended Complaint alleges extensive, serious problems with the Fundão dam beginning in 2009, up to its collapse in November 2015. It also alleges that Samarco's EAP was grossly deficient. Moreover, the Amended

[5] Some also contain statements of historical facts that are not adequately alleged to be false or misleading and/or have forward-looking statements, see, e.g., FAC ¶ 228, and are therefore protected for reasons described below, see infra I.C.

Complaint plausibly alleges that the Samarco board, Samarco executives, and BHP executives were aware of some of these problems and their potential consequences, yet did not address the problems effectively. See, e.g., FAC ¶¶ 66, 90-100, 122-27, 140-43, 180.

The materiality of these omitted risks is again indicated first by BHP's own acknowledgment, in its SEC filings, that "[s]afety, health, environmental and community impacts, incidents or accidents . . . may adversely affect our people, operations and reputation or license to operate," and that "[e]nvironmental incidents," including "uncontrolled tailings containment breaches," "have the potential to lead to material adverse impacts on our operations." 2014 Form 20-F at 29; 2015 Form 20-F at 29. Moreover, we reject defendants' argument that Samarco was not a large enough part of BHP's business to make these omissions material. Samarco was part of BHP's iron ore business, which generated the most revenue and profits of its four divisions during the relevant time period, and which BHP called a "key pillar" of its business. FAC ¶¶ 40-41. Samarco's iron ore reserves were comparable in size to (slightly smaller than) those of all of BHP's other iron ore assets combined. See FAC ¶ 39; 2014 Form 20-F at 184, available at https://www.sec.gov/Archives/edgar/data/

811809/000119312514351924/d753562d20f.htm; 2015 Form 20-F at 179; Hutchison, 647 F.3d at 488 ("If a particular product or productline, or division or segment of a company's business, has independent significance for investors, then even a matter material to less than all of the company's business may be material for purposes of the securities laws."). While Samarco contributed only 3% of BHP's total revenue in FY 2015, it appears to have contributed 4.85% ($577 million out of $11.9 billion) of BHP's "Underlying EBIT" ("a key financial measure used across the Group," according to BHP, representing "earnings before net finance costs, taxation, Discontinued operations and any exceptional items") in FY 2015 -- very close to the 5% standard considered a starting point for assessing materiality. See 2015 Form 20-F at 40, 201, available at https://www.sec.gov/Archives/edgar/data/811809/000119312515325671/d18314d20f.htm; see also Hutchison, 647 F.3d at 485. Moreover, the size of the impairments BHP took in the aftermath of the dam's collapse, and the damages sought in the various legal actions filed against BHP in Brazil, confirm that Samarco was a substantial asset and that the liability associated with a major failure of the dam was likely to be very significant. See Decl. of Joseph Russello in Opp. ("Russello Decl."), Ex. 8 (BHP Form 6-K dated August 16, 2016) (disclosing $2.2 billion

extraordinary expense relating to Samarco in 2016, with BHP overall net loss of $6.385 billion for the year). BHP has acknowledged that it faces further potential liability, including a $43 billion lawsuit by Brazil's independent prosecutor office, see BHP FY 2016 Form 20-F at 31, 287-90, available at https://www.sec.gov/Archives/edgar/data/811809/000119312516715037/d178736d20f.htm. These facts undercut defendants' argument that the omitted risks were material only in hindsight; rather, they indicate that "there is a substantial likelihood that a reasonable shareholder would [have] consider[ed]" the omitted risks "important in deciding how to [act]" at the time. Hutchison, 647 F.3d at 485.[6]

We now consider defendants' argument that the omitted risks were well known to investors. Defendants note that BHP included

[6] Defendants rely heavily on In re Union Carbide Class Action Securities Litigation, 648 F. Supp. 1322 (S.D.N.Y. 1986), in arguing that the Amended Complaint alleges only corporate mismanagement viewed in hindsight, not securities fraud. As plaintiffs observe, however, a crucial distinguishing factor in that case was that, "when Union Carbide made its statement concerning the corporation's environmental and safety qualifications, it knew that there were safety defects, but that steps were being taken to remedy these difficulties." Id. at 1328. Defendants' argument that the same is true here distorts the Amended Complaint, a fair reading of which does not suggest that the Samarco Board "knew that steps were being taken to remedy" the problems with the dam and the EAP. Rather, while the FAC indicates that the Board repeatedly expressed concern over the dam and tailings storage and at times emphasized the importance of addressing those issues, it does not indicate that the Board believed a sufficient, concrete remedial plan was in place, and to the contrary indicates that the Board ultimately ignored red flags and rejected prudent corrective proposals. Moreover, the Union Carbide plaintiffs alleged only one, very general misstatement. Id. at 1326.

two relevant cautionary statements in its 2014 and 2015 Forms 20-F. One was that "[e]nvironmental incidents have the potential to lead to material adverse impacts on our operations. These include uncontrolled tailings dam breaches . . . ." 2014 Form 20-F at 29; 2014 Form 20-F at 29. The other was the following statement:

> **Our non-operated assets may not comply with our standards**
> Some of our assets are operated and managed by joint venture partners or by other companies. Management of our non-operated assets may not comply with our management and operating standards, controls and procedures, including our health, safety, environment and community (HSEC) standards. Failure to adopt equivalent standards, controls and procedures at these assets could lead to higher costs and reduced production and adversely impact our results and reputation.

2014 Form 20-F at 29; 2014 Form 20-F at 28. Defendants also point out that the Amended Complaint itself acknowledges that the dangerous nature of tailings dams was a matter of public record before the Fundão dam's collapse.

Relatedly, defendants also argue that certain definitions BHP used in its 2015 Form 20-F make it clear that BHP was distinguishing between itself and Samarco and was not necessarily describing Samarco when it made the safety-related statements at issue. BHP's 2015 Form 20-F stated:

> BHP Billiton is a Dual Listed Company comprising BHP Billiton Limited and BHP Billiton Plc. The two entities continue to exist as separate companies but operate as

> a combined Group known as BHP Billiton. . . . Throughout this publication, the Boards are referred to collectively as the Board. . . . Throughout this Annual Report, the terms BHP Billiton, the Company and the Group refer to the combined group, including both BHP Billiton Limited and subsidiary companies and BHP Billiton Plc and subsidiary companies.

Seymour Decl. Ex. C at i. The 2015 report elsewhere states, "For a complete list of the Group's subsidiaries refer to Exhibit 8 List of Subsidiaries." 2015 Form 20-F at F-77. Exhibit 8 is titled "LIST OF SUBSIDIARIES OF BHP BILLITON LIMITED AND BHP BILLITON PLC." 2015 Form 20-F Ex. 8, available at https://www.sec.gov/Archives/edgar/data/811809/000119312515325671/d18314dex81.htm. It contains several headers, including "Fully owned subsidiaries," "Subsidiaries where the effective interest is less than 100%," "Joint operations," and "Joint ventures and associates." Id. Samarco is listed under the latter.

We are not persuaded by these arguments. First of all, in their sections describing BHP's iron ore division, BHP's 2014 and 2015 Form 20-Fs both described Samarco as one of two of "our operations." 2014 Form 20-F at 57 (emphasis added); 2015 Form 20-F at 135 (same). Moreover, as confirmed by BHP's counsel at oral argument, the 2014 20-F does not contain a definitional statement similar to the one in the 2015 20-F. Nor does either Form 20-F define what BHP means when it says "we" or "us" in the report, in

contrast to Vale's annual reports, which expressly defined those pronouns to refer to Vale and its consolidated subsidiaries, In re Vale S.A. Sec. Litig., 2017 WL 1102666, at *23. In light of these issues, the alleged safety-related misrepresentations could reasonably be construed by investors as encompassing Samarco. See, e.g., FAC ¶ 242 ("Our operations are required to have systems in place to identify and effectively manage foreseeable crises and emergencies. This ensures our operations can deal with potential causalities, to limit harm and to safely return to full function as soon as possible." (emphasis added)), 210 ("Keeping our people safe and healthy, across all our operations, matters more to me than anything else.").

Moreover, while BHP's cautionary disclosures about tailings breaches and its non-operated assets had some substance, they were general disclosures that did not alert investors to the very particular, concrete, and grave risks relating to Samarco and the Fundão dam. BHP merely suggested that a non-operated asset such as Samarco "may not comply with our standards" (emphasis added), when in fact plaintiffs' allegations indicate that BHP knew that Samarco was not complying with BHP's stated standards for safety and risk management. Similarly, BHP merely alluded to the general "potential" for tailings containment breaches even though the

Amended Complaint indicates that BHP was aware of a particular and potentially substantial risk of failure at Samarco. See Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 105 (2d Cir. 2015) ("generic cautionary language" about "the deterioration of the real estate, credit, and subprime mortgage markets, and its potential negatively to affect Morgan Stanley" was insufficient when defendant should have disclosed more specifically "that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposure to those markets, and that if the trends came to fruition, the company faced trading losses that could materially affect its financial condition"). Similarly, the risks otherwise known to investors about tailings dams generally from public reports, as acknowledged in the Amended Complaint, cannot insulate defendants here.

Accordingly, plaintiffs have adequately alleged that the statements identified above were materially false or misleading, and that defendants omitted facts needed to make the statements not misleading.[7]

**B. Statements regarding compliance with local laws and regulations (¶¶ 254-59)**

Plaintiffs also challenge three statements made by defendants

[7] This holding does not imply that, taking the complaint as true, defendants needed to disclose every alleged problem relating to the dam and the EAP.

about their commitment to complying with local laws and regulations. We agree with defendants that these statements are too aspirational and general too be actionable. The claims based on these statements are therefore dismissed.

### C. Statements regarding Samarco's production capacity and projected performance (¶¶ 260-66)

The statements in this category primarily consist of statements BHP made regarding Samarco's operational results, such as its statement, in a January 21, 2015 press release, filed as an attachment to Form 6-K with the SEC on the same date, that "Samarco production for the nine months ended March 2015 increased by 37 per cent to a record 22 Mt (100 per cent basis) as the fourth pellet plant reached full capacity during the period." FAC ¶ 260; see also id. ¶¶ 261-62 (similar). Plaintiffs also challenge Mackenzie's statement in BHP Plc's August 25, 2015 full-year earnings presentation that "[w]e've built a strong track record over the last three years and delivered productivity gains of over $10 billion and we'll continue to deliver lower and lower costs as we run our operations more and more safely and more and more efficiently." FAC ¶ 263.

Plaintiffs argue that these statements were materially misleading "in the absence of disclosure of the significant structural and other problems affecting Samarco's mining

operations" that "reasonably could prevent Samarco from achieving such production on an ongoing basis." FAC ¶ 265.

While plaintiffs' challenge to these statements has some logical appeal, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 39 (2d Cir. 2012) (quoting In re Sofamor Danek Grp., Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997)); see also id. at 38 ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").

The forward-looking component of Mackenzie's statement, moreover, is entitled to safe harbor protection. See 15 U.S.C. § 78u-5(c). The presentation was accompanied by a disclaimer identifying the type of statement Mackenzie made as forward-looking and warning investors that actual results could differ from projected results, including because of the risk factors identified in BHP's annual reports and other SEC filings. Seymour Decl. Ex. E, at 2. Even though the cautionary statement did not discuss the specific risks at Samarco, the safe harbor statute requires only "meaningful cautionary statements identifying important factors that could cause actual results to differ

materially," 15 U.S.C. § 78u-5(c)(a)(1)(A). We believe the cautionary statements included were sufficiently meaningful. Investors cannot reasonably rely on such forward-looking statements to the same extent as they rely on statements regarding past and contemporaneous matters. Further, plaintiffs have stated that their theory of "scienter in this case is based solely on recklessness." Pls.' Opp. at 26. For a forward-looking statement to be actionable, it must be alleged that the statement was made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).

Accordingly, the claims based on these statements are dismissed.

**D. Statements regarding the toxicity of the mudflow released by the dam's collapse (¶¶ 267-76)**

Plaintiffs allege that defendant Mackenzie made several misleading statements, on two occasions, about the toxicity of the mudflow released by the dam's collapse. At a conference call with investors on November 16, 2015 – 11 days after the dam's collapse – Mackenzie was asked, "Do you have any indication as to the chemical composition of the tailings material and sediment?" He responded:

> Yes, we do broadly. The headline is that the tailings material is reasonably inert. It is effectively the reject from a density separation to concentrate the iron

> ore. It is a mixture of iron ore and what occurs in banded iron formations, which is a cherty silica that has been ground more finely. It is not inherently active and does not contain things like heavy metals. It is slightly acidic but, with the dilution, is reasonably benign. I do not want to go beyond that. We need to do more investigation. We have to a lot of baselining to see what is really happening, but the mixture is broadly inert.

FAC ¶ 267.

On November 19, 2015, Mackenzie reiterated to reporters that the tailings released posed little environmental harm and was "less challenging" to remediate "than it otherwise might have been," stating, in pertinent part: "[t]his is relatively inert material . . . it's iron ore, clay, a bit of silica that has been finely ground. So that makes it less challenging than it might otherwise have been to remediate[.]" FAC ¶ 269.

Plaintiffs allege that the results of several tests that were conducted, including tests analyzed by United Nations Special Rapporteurs, subsequently contradicted Mackenzie's statements. Specifically:

> On November 25, 2015, the United Nations issued a press release specifically refuting defendant Mackenzie's claims that the tailings released from the Fundão dam and the resulting mudflow were inert, benign and relatively harmless. As the United Nations reported:
>
> > New evidence shows the collapse of a tailing dam belonging to a joint venture of Vale and BHP Billiton (Samarco Mining S.A.), which released 50 million tons of iron ore waste, contained high

> levels of toxic heavy metals and other toxic chemicals in the river Doce. Hospitals in Mariana and Belo Horizonte, the capital city of Minas Gerais State have received several patients.

FAC ¶ 270. Further, "[a]ccording to reports associated with the United Nations' inspection, multiple tests conducted in towns on the Rio Doce confirmed that the mudflow contained dangerously high levels of toxic heavy metals including arsenic, barium and manganese." FAC ¶ 271. "Additionally, after the release of the United Nations' results, further evidence emerged that confirmed the presence of toxins in the mudflow resulting from the tailings. Multiple tests, including those conducted on behalf of IGAM, confirmed the presence of toxic heavy metals in the mudflow. In fact, even Vania Somavilla ("Somavilla"), Vale's executive director of human relations, health and safety, sustainability and energy, admitted the flow of tailings released from the dam may have upset toxic elements settled in the bed of the Rio Doce, or along its banks." FAC ¶ 274.

Plaintiffs allege that Mackenzie's statements were "false and misleading when made and otherwise lacked a reasonable basis in fact. When . . . Mackenzie made these statements . . . a reasonable investor would have assumed that he had tested the composition and toxicity levels of the tailings and mudflow and

had a reasonable basis to conclude that the materials were, in fact, inert, benign and relatively harmless." FAC ¶ 273.

Defendants argue that plaintiffs fail to identify the reasons why Mackenzie's statements were false, because "none of the reports or statements assert that the tailings contained toxic metals or that toxins were introduced into the Rio Doce in the tailings themselves." Defs.' Opening Br. at 24-25. Defendants argue that, "as the Complaint alleges, the reports and statements simply say that 'the flow of tailings released from the dam may have upset toxic elements settled in the bed of the Rio Doce, or along its banks.'" Id. at 25 (quoting FAC ¶ 274).[8]

Plaintiffs sufficiently allege that Mackenzie's statements were false or misleading. The test result reports cited in the Amended Complaint do not specify whether the toxic heavy metals were contained in the tailings themselves or already existed in

[8] The Court also bought to the parties' attention the fact that plaintiffs in the parallel Vale litigation alleged that, after the dam's collapse, Vale stated that "all reports from the quality of the material that was deposited in the former Fundão Dam made in 2013 and 2014" indicated the tailings were not dangerous, and that a November 8, 2015 "analysis requested by Samarco attests that the waste from the Fundão Dam offers no harm to people or the environment." In re Vale S.A. Sec. Litig., 2017 WL 1102666, at *37-38. At the Court's request, the parties submitted argument on the relevance of these allegations. Having reviewed and considered those submissions, we agree with plaintiffs that, in essence, it would require resolving too many factual questions in favor of defendants to rely on the allegations at this stage on the questions of falsity and scienter. See, e.g., Goel v. Bunge, Ltd., 820 F.3d 554, 560 (2d Cir. 2016); Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70–71 (2d Cir. 1998). Upon close reading of the cases cited by defendants on this point, we do not find them to the contrary.

the Rio Doce. The only source mentioned in the Amended Complaint suggesting that the toxins may have already existed in the river bed was a Vale executive, whose statement obviously must be regarded skeptically. Whether the tailings themselves contained the toxins is clearly a fact question, and plaintiffs' allegations derived from the test results suffice at the pleading stage to plausibly allege that Mackenzie's statements were false or misleading.

**E. Statements regarding the status of the Company's progressive dividend policy (¶¶ 277-83).**

Plaintiffs also challenge the following statements defendants made regarding BHP's progressive dividend policy:

- In the 2014 Form 20-F, BHP explained that the objective of its progressive dividend policy "is to steadily increase or at least maintain our base dividend in US dollars at each half yearly payment. Our progressive base dividend is the minimum annual distribution that a shareholder should expect and is expected to grow broadly in accordance with the growth of our business." As the Company explained in the 2014 Form 20-F, "returning excess capital to shareholders firstly with its progressive dividend policy" is a fundamental priority for cash flow.

- The Company repeatedly referenced its progressive dividend policy in Forms 6-K, providing a similar, if not identical, description of the policy to that contained in the 2014 Form 20-F. In fact, on August 25, 2015, defendant Mackenzie rejected the prospect of abandoning the progressive dividend

policy, stating: "[O]ver my dead body sounds a little strong but it's almost right."[9]

- In the 2015 Form 20-F, BHP again provided a description of the progressive dividend policy. Additionally, in the CEO's Report section of the 2014 Form 20-F, defendant Nasser stated: "Improved operational productivity has generated strong cash flow to fund the progressive dividend, maintain a solid 'A' credit rating and allow us to continue to invest in growth."

FAC ¶¶ 278-80. Plaintiffs allege that these statements "led investors to believe that management was confident in the Company's ability to meet or exceed past dividend levels," and were materially false and misleading "in the absence of disclosure of the problems then-affecting Samarco." Moreover, "[g]iven the existence of significant problems at Samarco and the risk of catastrophic failure at the Fundão dam – which later came to fruition – it was unreasonable for Defendants to represent that the progressive dividend would remain in place." FAC ¶ 281.

Plaintiffs have not adequately alleged that these statements were misleading or otherwise actionable. First, plaintiffs do not

[9] Plaintiffs omit important context pertinent to this statement. Mackenzie made the statement in response to an analyst who was asking whether BHP would consider using some of its cash flow to make acquisitions instead of paying dividends and, as part of that inquiry, specifically asked, "Should we assume that it is over your dead body that the dividend gets cut?" Right after Mackenzie made the above statement, Mackenzie went on to explain, "You should not doubt the commitment of every single person who works for BHP Billiton to look after this progressive dividend, after we have made sure that our balance sheet is strong and our operations are safe." Semyour Decl. Ex. L at 9 (transcript of Aug. 25, 2015 investor and analyst briefing).

argue that the progressive dividend policy was not indeed a priority of the Company. Moreover, the statements were either inherently aspirational or forward-looking in nature, and in the latter case are protected by the PSLRA's safe harbor for the reasons described above, see supra I.C, because they were accompanied by the same meaningful cautionary statements, and because plaintiffs do not claim that the statements were made with actual knowledge that they were false or misleading.

**F. Item 303, Item 503**

We have already held that that plaintiffs have sufficiently alleged that defendants omitted facts needed to make certain of their statements about safety not misleading. Plaintiffs further claim that defendants should have made affirmative disclosures -- about "the issues that afflicted the Fundão dam" and "the precarious condition of Samarco's operations," including the dam's design defects and structural problems, and lack of a viable EAP and adequate monitoring systems, see, e.g., FAC ¶¶ 205, 207, 284-89 –- pursuant to Item 303 and Item 503(c) of the SEC's Regulation S-K. We address these claims in turn.

**1. Item 303**

Item 303 requires that management in annual reports "[d]escribe any known trends or uncertainties that have had or

that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). In interpretive guidance, the SEC has stated that, under this regulation,

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> > (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
> >
> > (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.
>
> Each final determination resulting from the assessments made by management must be objectively reasonable, viewed as of the time the determination is made.

SEC, Management's Discussion & Analysis of Financial Condition & Results of Operations, Release No. 6835 (May 18, 1989).

The Second Circuit has held that violations of Item 303 are actionable under 10b-5 if the omission also meets all of the standard elements of a 10b-5 claim, including the materiality standard. Stratte-McClure, 776 F.3d at 101-04. It has also held

that Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016).

Defendants offer several arguments for dismissal of this claim. Apart from the arguments previously rejected, defendants' remaining argument is that the alleged risks relating to the Fundão dam and Samarco's operations are not "events" that, at the time, were "reasonably likely" to have a material effect on BHP Billiton's economic condition.

In analyzing this claim, we begin with the text of the regulation, which concerns "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). In our view, the "reasonably expects will have" standard suggests that there must a fairly substantial probability that the known risk at issue will materialize and have a material impact –- if not a more-likely-than-not standard, then something not too much below that. The interpretive guidance, in turn, uses the similarly high standards "likely to come to fruition" and "reasonably likely to occur," further suggesting a quite substantial probability threshold both as to the occurrence

of the event and the likelihood of a material resulting impact. Interpreting Item 303 to impose this type of substantial probability requirement seems appropriate given that the regulation creates an affirmative disclosure obligation that, if interpreted more broadly, could require burdensome analysis by companies of myriad unlikely events.

Applying the regulation, we conclude that plaintiffs have not plausibly alleged facts to meet this standard. While the Amended Complaint plausibly alleges that BHP knew of serious risks with the Fundão dam, and that the dam was in fact at a serious risk of catastrophic failure, it does not go so far as to plausibly allege a risk "known" to BHP that was both "likely to come to fruition" and "reasonably likely" to have "a material effect on" BHP. 17 C.F.R. § 229.303(a)(3)(ii). It is, rather, quite implausible that BHP would neglect to address a known risk relating to the dam rising to the Item 303 level, especially since the risk of failure of the dam was a type of risk that BHP and Samarco had the capacity to control. The fact that the "trend or uncertainty" here -- the problems with the dam -- was essentially within BHP's and Samarco's control makes this case distinguishable from Second Circuit cases upholding allegations of Item 303 violations, where the risks seem to have been more beyond the corporate managers' control and it

was thus more plausible that those risks could grow to the point of being sufficiently severe to trigger an Item 303 duty to disclose. See SAIC, 818 F.3d at 96; Stratte-McClure, 776 F.3d at 101-04; Panther Partners Inc. v. Ikanos Communc's, Inc., 681 F.3d 114, 121 (2d Cir. 2012). This case, in contrast, falls closer to Lopez v. Ctpartners Exec. Search Inc., 173 F. Supp. 3d 12 (S.D.N.Y. 2016), where the court held that plaintiffs had not adequately alleged a known uncertainty that was reasonably likely to have a material impact, id. at 34. Reinforcing our conclusion is the fact that the FAC does not indicate that a failure of the dam as total as the one that occurred was the only possible failure scenario. The failure that occurred -- which started as a "leak" that employees tried to address, but that turned into a "burst" of the dam, "releasing 12,000 Olympic swimming pools' worth of wastewater," FAC ¶ 2, 144 -- appears to have been about as catastrophic as was possible. Lesser failures of the dam would likely have not resulted in such a devastating impact and, consequently, a material financial impact on BHP. Thus, in contrast to situations where the "trend, demand, commitment, event or uncertainty" is a more straightforward, "either/or"-type proposition, the risks relating to the Fundão dam were fairly clearly of a more complex nature. That factor makes it further

implausible that defendants “knew” of a particular risk likely to transpire and have a material impact.

Accordingly, this claim is dismissed.

**2. Item 503**

Item 503(c), part of the subpart of Regulation S-K titled “Registration Statement and Prospectus Provisions,” requires that a registrant, “[w]here appropriate, provide under the caption ‘Risk Factors’ a discussion of the most significant factors that make the offering speculative or risky.” 17 C.F.R. § 229.503(c).

“Although there is scant caselaw on Item 503, the inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid.” Christine Asia Co. v. Alibaba Grp. Holding Ltd., 192 F. Supp. 3d 456, 477 (S.D.N.Y. 2016) (internal quotation marks omitted). However, it appears to us that Item 503 applies only to registration statements and prospectuses, thus making plaintiffs’ reliance on this provision misplaced when they argue that defendants violated the provision by virtue of omissions in the Forms 20-F. Moreover, the disclosures required by Item 503(c) are limited to “the most significant factors that make the offering speculative or risky.” Id. (emphasis added). To the extent that Item 503 even applies to the disclosures at issue, while we find the alleged omissions material, we do not believe they rise to the

level of the considerably higher "most significant factors" standard. Therefore, the alleged omissions are not actionable under Item 503.

## II. Scienter

To summarize, plaintiffs have plausibly alleged materially misleading statements about BHP's commitment to safety and risk management controls, and materially misleading statements by Mackenzie after the incident regarding the chemical composition of the tailings. We now turn to defendants' arguments that plaintiffs have not adequately alleged scienter.

"[T]o plead scienter, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' as required by the language of the [Exchange] Act itself." Novak, 216 F.3d at 311. Plaintiffs must allege "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). In this circuit, "recklessness is a sufficiently culpable mental state." ECA, 553 F.3d at 198. "[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to

information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Novak, 216 F.3d at 311 (citations omitted); see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) ("A plaintiff can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." (internal quotation marks omitted)).

"[T]o qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (quoting Tellabs, 551 U.S. at 314).

Here, plaintiffs do not allege motive or that defendants received a concrete and personal benefit; therefore, "the strength of the circumstantial allegations [indicating conscious behavior] must be correspondingly greater." Kalnit, 264 F.3d at 142 (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)).

Plaintiffs allege scienter on the part of both BHP and the Individual Defendants. We begin with BHP's scienter.

**A. Corporate Scienter**

Corporate scienter may be alleged by "pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Dynex, 531 F.3d at 195–96).

"There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants. . . . Furthermore, the individual making an alleged misstatement and the one with scienter do not have to be one and the same." In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 515–16 (S.D.N.Y. 2009), opinion corrected on denial of reconsideration, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (citations omitted); see also Loreley, 797 F.3d at 177-78 (allegations that a managing director of Wachovia knew of undisclosed facts making its representations misleading were sufficient to plead Wachovia's scienter); In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (imputing knowledge of

regional vice president and vice president of department to corporate defendant); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (similar).

We have no trouble concluding that plaintiffs have adequately alleged corporate scienter for the surviving pre-collapse alleged misstatements and omissions.[10] Contrary to defendants' contentions, the Amended Complaint alleges with particularity facts indicating that the BHP executives who served on Samarco's board had access to information that revealed the statements and omissions to be misleading. These allegations include the following:

- According to Brazilian newspaper Jornal ES Hoje, the investigation report compiled by Brazil's federal police "concludes that Samarco, though its directors and CEO, knew that the dam had cracks, that control equipment was broken, and was aware of the risks to Bento Rodrigues posed by the dam. According to Moura, 'we also found that the operations manual was outdated and risk manual had not been updated for over three years.' Even worse, according to Moura, Samarco had research showing how Bento and Moura stated that '[i]nvestigations also led us to find messages exchanged on the Samarco's internal communication system in which the board was informed about the deficiencies of the dam.'" FAC ¶ 180 (emphasis added).

- After Samarco hired Fonesca to develop an EAP because an independent audit found Samarco's EAP severely deficient, the Samarco Board in 2009 rejected Fonesca's proposal for a $1.5

[10] We address BHP's scienter relating to Mackenzie's post-incident statements about the tailings below.

million EAP because it was too expensive, and left the original EAP in place. FAC ¶¶ 140-43.

In arguing that plaintiffs have not pled with particularity facts supporting their allegations of corporate scienter, defendants simply (and quite misleadingly) avoid these crucial allegations, which are far more incisive, for example, than those deemed insufficient in Sinay v. CNOOC Ltd., No. 12 Civ. 1513 (KBF), 2013 WL 1890291 (S.D.N.Y. May 6, 2013), on which defendants rely.

Moreover, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322–23. Thus, in light of the above allegations directly indicating that the Samarco Board knew facts making defendants' statements and omissions misleading, other, more indirect allegations take on additional significance and further support an inference of scienter. These include the allegations that Samarco executives, including CEO Vescovi, were informed of the cracks in the dam and the grave risks they posed; that Samarco Board meeting minutes show that the Board repeatedly discussed its concern over tailings disposal and the associated risks; that Brazilian police concluded that Samarco itself was "more than negligent" and the collapse was

"not an accident"; and that Brazilian authorities charged Samarco executives with the equivalent of involuntary manslaughter over the dam's collapse. Moreover, as plaintiffs' intend to add to their complaint, Brazilian authorities subsequently charged Wilson, Randolph, and other BHP executives serving on the Samarco board with involuntary manslaughter.

The Amended Complaint alleges that Wilson, who was president of BHP's Iron Ore division and a member of its Group Management Committee, was also a member of the Samarco board beginning in 2012 (serving as chair of the board in 2014, and VP in 2015), and was authorized to make statements on the Company's behalf, which he did during the Class Period. It further alleges that Randolph was BHP's Chief Executive of Ferrous & Coal and a member of the Group Management Committee, and served as Chairman of the Samarco Board in 2012 and its vice president during the first half of 2013, when he departed BHP and was replaced by Wilson. The Amended Complaint further alleges that Zweig served as BHP's vice president of Strategy and Development in its iron ore business from 2012 to late 2014, and served as a regular director on Samarco's board beginning in April 2013. Plaintiffs further allege that Wilson and (before his departure) Randolph were at many of the Samarco board meetings at which the concerns relating to tailings dams and

Bento Rodrigues were discussed. These allegations are clearly sufficient to impute these executives' knowledge and intent to BHP. Because the Amended Complaint raises a strong inference (at least as compelling as the competing inference) that these executives knew or should have known of facts suggesting that BHP's public statements and disclosures relating to the risks at Fundão and Samarco and BHP's risk management policies were not complete and accurate, plaintiffs have adequately alleged BHP's scienter with respect to the surviving pre-collapse statements and omissions.

**B. Individual Defendants' Scienter**

We now turn to defendants' arguments that plaintiffs have not adequately alleged that the Individual Defendants (BHP's CEO, Mackenzie; chairman of the board, Nasser; and successive CFOs Beaven and Kerr) acted with scienter. We address the question in relation to each of the omissions and statements we have held actionable.

First, we find that, although plaintiffs have adequately alleged that BHP acted with scienter in omitting to disclose the material risks relating to the Fundão dam and Samarco's operations, and in misrepresenting its safety and risk management controls, they have not adequately alleged that any of the Individual

Defendants acted with scienter with respect to these matters. Other than Nasser's admission that "we looked at" the Pristino Report, plaintiffs' allegations notably fail to identify "specific contradictory information" that "was available to the [individual] defendants . . . at the same time they made their [allegedly] misleading statements." In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009); see also Novak, 216 F.3d at 309. While we believe Nasser's comment regarding the Pristino Report can be plausibly interpreted to mean that he and BHP's top executives -- including the other Individual Defendants -- were aware of the contents of the report, the report was publicly available, reducing any inference of scienter that could otherwise be drawn therefrom. See, e.g., Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010).

Plaintiffs' additional arguments do not alter the outcome. Plaintiffs argue that Samarco was a "core operation of BHP," imposing a duty on the Individual Defendants to familiarize themselves with it. Although the alleged omissions and misstatement relating to the Fundão dam were material, Samarco was not significant enough to BHP's condition to meet the more demanding "core operation" standard. See, e.g., Tyler v. Liz Claiborne, 814 F. Supp. 2d 323, 343-44 (S.D.N.Y. 2011) (finding

that segment representing 16 percent of parent company’s revenue was not core operation and noting that “courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the ‘core operations doctrine.’”). Plaintiffs also argue that the legal proceedings commenced against BHP, its executives, and Samarco’s executives, especially the criminal proceedings, support an inference of scienter, but none of the Individual Defendants have been charged in those proceedings. Nor do Wilson’s replacement as the Group Management Committee member responsible for oversight of Samarco and his departure from BHP shortly after the dam’s collapse, and Nasser’s resignation from BHP nearly a year after the collapse, strongly indicate that the Individual Defendants acted with scienter.

Accordingly, we hold that plaintiffs have not adequately alleged scienter on the part of the Individual Defendants with respect to the surviving pre-incident statement and omissions, including under a control person theory pursuant to Section 20(a) of the Exchange Act. See, e.g., In re ForceField Energy Inc. Sec. Litig., No. 15 CIV. 3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (noting disagreement over whether Section 20(a) claims must plead scienter on part of controlling person, but

adhering to majority view in this District that plaintiff must plead culpable participation).

Defendants also argue that plaintiffs have not sufficiently alleged that Mackenzie acted with scienter with respect to his statements about the composition of the tailings. Specifically, defendants argue that "the Complaint does not allege a single fact contrary to Defendant Mackenzie's statements regarding the nature of the tailings mudflow that Defendant Mackenzie purportedly received prior to making those statements. As a result, Plaintiffs have not even attempted to plead a strong inference of scienter with regard to these challenged statements." Defs.' Opening Br. at 33. To support this proposition, defendants cite Glaser v. The9, Ltd. for the proposition that "plaintiffs must allege 'specific instances in which Defendants received information that was contrary to their public declarations.'" 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011).

As mentioned above, in Novak, the Second Circuit explained that an inference of scienter "may arise where the complaint sufficiently alleges that the defendants . . . knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor . . . ." 216 F.3d at 311 (citations omitted). The

court further explained that, in this circuit, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Id. at 308. However, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects. Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309.

Here, plaintiffs base their theory of Mackenzie's scienter primarily on the fact that the test results analyzed and reported by the U.N. Special Rapporteurs found high levels of toxic heavy metals in the Rio Doce after the incident. Secondarily, plaintiffs also point to their allegations that Mackenzie is an acclaimed geoscientist, and that BHP's November 11, 2015 Form 6-K stated that he was personally present in Brazil with Wilson to oversee BHP's response to the dam collapse on November 11, 2015, see Russello Decl. Ex. 8.

Notably, however, while plaintiffs essentially suggest that Mackenzie "had access to contrary facts," they do not "specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. Plaintiffs therefore have failed to offer the type of allegation classically needed to establish a "strong inference" of scienter under the PSLRA. See In re Vale Sec. Litig., 2017 WL 1102666, at *33 (allegations of scienter insufficient where plaintiffs did not allege that "anybody at Vale had received or reviewed [the U.N.] report prior to [the date of the CEO's statement]"). Moreover, the problem with relying on the post-incident tests conducted on the Rio Doce is that the tests leave open a very real possibility that the tailings were benign as Mackenzie stated, but that the mudflow disturbed or swept up toxic heavy metals already in the river or in the vicinity. While those tests are enough to plausibly allege the statements' falsity, we do not believe they are enough, even combined with Mackenzie's qualifications and presence in Brazil after the dam collapse to oversee the response effort, to meet the PSLRA's more stringent scienter pleading standard. Thus, plaintiffs have not adequately alleged that Mackenzie's statement was knowingly false or was so lacking a reasonable basis as to constitute recklessness that "borders on actual intent" or is "the functional equivalent of

intent." In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331, 349 (S.D.N.Y. 2001) (pleading facts amounting to "simple or even inexcusable negligence will not suffice").

Accordingly, plaintiffs have sufficiently alleged BHP's scienter as to the sustained pre-incident alleged misstatements and omissions, but not as to Mackenzie's post-incident statements about the tailings.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part. To summarize, plaintiffs have sufficiently alleged that BHP made actionable misstatements regarding its commitment to safety and its risk management controls, and omissions of facts needed to make these statements not misleading. Plaintiffs' claims are dismissed to the extent that they are based on the other alleged misstatements and omissions.

**SO ORDERED.**

Dated: New York, New York
August 28, 2017

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE