UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

In re BHP BILLITON LIMITED
SECURITIES LITIGATION

———————————————————

This Document Relates To:

    ALL ACTIONS.

——————————————————— x

:   Civil Action No. 1:16-cv-01445-NRB
:
:   <u>CLASS ACTION</u>
:
:
:   MEMORANDUM OF LAW IN SUPPORT
:   OF LEAD PLAINTIFFS' MOTION FOR
:   CLASS CERTIFICATION
:
:
:

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ...................................................................................3

III. ARGUMENT ..........................................................................................................8

    A.   The Class Certification Standards.............................................................8

    B.   Rule 23(a)'s Requirements Are Satisfied .................................................9

        1.   The Class Consists of Hundreds, if Not Thousands, of Members ..............9

        2.   Common Questions of Law and Fact Exist ...............................................10

        3.   Lead Plaintiffs' Claims Are Typical of The Class's.................................11

        4.   Lead Plaintiffs Will Fairly and Adequately Represent the Class .............12

    C.   Rule 23(b)(3)'s Requirements Are Satisfied...........................................14

        1.   Common Questions of Law and Fact Predominate ...................................14

            a.   Reliance is Presumed Under the Fraud-On-The-Market
               Theory Because the ADRs Traded in Efficient Markets ..............15

                  (1)   The ADRs Actively Traded on the NYSE, Which is
                      Widely Regarded as an Efficient Market..........................17

                  (2)   Numerous Securities Analysts Followed the ADRs
                      and Issued Reports on BHP ...............................................17

                  (3)   Market-Making Activity Promoted the Liquidity of
                      the ADRs and Institutional Investing................................18

                  (4)   BHP Was Eligible to File a Form F-3 During the
                      Class Period and Did So ....................................................19

                  (5)   The Trading Price of the ADRs Reacted to News,
                      Evidencing a Cause-and-Effect Relationship ...................19

                  (6)   The *Krogman* Factors Also Support a Finding of
                      Market Efficiency ..............................................................22

               b.   Reliance is Also Established Under *Affiliated Ute* Because
               Certain Aspects of the Claims Are Based on Omissions..............23

**Page**

           c.      As Dr. Feinstein Has Shown, Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology................24

    2.      A Class Action Is Superior to Alternate Methods of Adjudication ..........25

IV.    CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)...................................................................................15, 23, 24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)...........................................................................................2, 8, 14

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................................................12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................15

*Basile v. Valeant Pharm. Int'l, Inc.*,
2017 U.S. Dist. LEXIS 37400 (C.D. Cal. Mar. 15, 2017).....................................24

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ..........................................................10, 19, 23, 25

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ......................................................................16, 19

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................................14, 20

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
2018 U.S. Dist. LEXIS 97338 (D. Md. June 8, 2018)............................................22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................................24

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995).........................................................................................9

*Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................................25

*Dietrich v. Bauer*,
192 F.R.D. 119 (S.D.N.Y. 2000) .............................................................................10

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) .............................................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).................................................................................................14

**Page**

*Fogarazzo v. Lehman Bros.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ....................................................................................23, 24

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ..................................................................................................15

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004)..............................................................................................6

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ....................................................................................18

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ...............................................................................11, 12

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)...................................................................... *passim*

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992).........................................................................................12

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .....................................................................8, 9, 11, 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).....................................................................................8, 11, 12

*In re Groupon Inc. Sec. Litig.*,
2015 U.S. Dist. LEXIS 27334 (N.D. Ill. Mar. 5, 2015)....................................................20, 21

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) .....................................................................................22

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)..............................................................................................9

*In re JPMorgan Chase & Co. Secs. Litig.*,
2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015)............................................ *passim*

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
2018 U.S. Dist. LEXIS 33640 (S.D.N.Y. Feb. 28, 2018)............................................9, 10, 11

*In re Petrobras Sec. Litig.*,
862 F.3d 250 (2d Cir. 2017).......................................................................................16, 20

**Page**

*In re Pfizer Inc. Secs. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................14, 25

*In re Virtus Inv. Partners, Inc.*,
  2017 U.S. Dist. LEXIS 73554 (S.D.N.Y. May 15, 2017)...........................2, 9, 10, 24

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) .....................................................................10, 11

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ..............................................................17, 18, 19

*Johnson v. Nextel Commc'ns, Inc.*,
  780 F.3d 128 (2d Cir. 2015)...............................................................................10

*Korn v. Franchard Corp.*,
  456 F.2d 1206 (2d Cir. 1972) ..............................................................................8

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................16

*Ligon v. City of New York*,
  288 F.R.D. 72 (S.D.N.Y. 2013) ...........................................................................11

*Maywalt v. Parker & Parsley Petroleum Co.*,
  147 F.R.D. 51 (S.D.N.Y. 1993) ............................................................................8

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)....................................................................18

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006)...............................................................................................8

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)..............................................................................14

*Public Emples. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
  280 F.R.D 130 (S.D.N.Y. 2012) ..........................................................................25

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)................................................................................24

*Schleicher v. Wendt*,
  2009 U.S. Dist. LEXIS 24810 (S.D. Ind. Mar. 20, 2009).....................................21

Page

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................................17

*Sykes v. Mel S. Harris & Assocs.*,
  780 F.3d 70 (2d Cir. 2015).................................................................................24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)...............................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................8

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  2018 U.S. Dist. LEXIS 14744 (D. Minn. Jan. 30, 2018).....................................23

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)....................................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................................10

## STATUTES, RULES AND REGULATIONS

17 C.F.R.
  §240.15c3-1(c)(8) ...............................................................................................19

Federal Rules of Civil Procedure
  Rule 23 .............................................................................................................1, 8, 9
  Rule 23(a).....................................................................................................1, 8, 9, 26
  Rule 23(a)(3) .......................................................................................................11
  Rule 23(b) ..............................................................................................................8
  Rule 23(b)(3) ...........................................................................................1, 9, 14, 26
  Rule 23(g) ...............................................................................................1, 14, 26

Lead Plaintiffs City of Birmingham Retirement and Relief System and City of Birmingham Firemen's and Policemen's Supplemental Pension System (together, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 23(a), (b)(3) and (g) ("Rule 23"), for an Order: (i) certifying a class of purchasers of the American Depositary Receipts ("ADRs") of defendants BHP Billiton Limited ("BHP Ltd.") and BHP Billiton Plc ("BHP Plc") (together, "BHP") from September 25, 2014 to November 30, 2015 (the "Class Period"); (ii) appointing Lead Plaintiffs as Class Representatives; and (iii) designating Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.      INTRODUCTION

"This lawsuit arises out of the November 5, 2015 collapse" of the Fundão iron-ore tailings dam, "widely regarded as the worst environmental disaster in Brazil's history." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 70 (S.D.N.Y. 2017) (Buchwald, J.).  During the Class Period, BHP represented that it "maintain[ed] a relentless focus on the health and safety of our people and the communities in which we operate" and characterized "safety performance as a critical indicator of a business in control," while assuring investors that "[o]ur operations are required to have systems in place to identify and effectively manage foreseeable crises and emergencies." ¶¶199, 218, 242.[1] In truth, the dam was beset by pervasive – yet publicly undisclosed – structural, maintenance, and other problems for years.  *See BHP*, 276 F. Supp. 3d at 71 (noting the CAC's "extensive allegations of structural problems with the Fundao dam dating back to 2009").  The issues ranged from drainage problems and the lack of an emergency action plan in 2009 to visible cracks in the wall of the dam in 2014, not long before the collapse occurred.  *See id.* at 72-74.

---

[1]      Paragraphs of the Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC") – whose surviving claims allege that BHP violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 – are cited as "¶__."  All exhibits referenced herein are cited as "Ex.__" and are attached to the June 29, 2018 Declaration of Joseph Russello, submitted in support of this motion.

When the dam failed in November 2015, it "unleashed a flood of tailings that destroyed the nearby town of Bento Rodrigues" and "killed 19 people . . . ." *Id*. at 71. "The price of [the] ADRs declined substantially on news of the dam collapse and suffered further declines as more information about the dam collapse came to light" (*id*.), exposing the truth regarding BHP's Brazilian mining operations and its sustained disregard for safety and risk management. In the wake of the failure, BHP was subjected to civil, criminal and regulatory proceedings in Brazil and exposed to billions of dollars in potential liability, while BHP representatives tasked with oversight of the operations were "charged by Brazilian prosecutors with the equivalent of involuntary manslaughter in connection with the dam's collapse." *See id*. at 71, 76. This lawsuit followed, alleging Section 10(b) violations.

Lead Plaintiffs now seek to certify a class consisting of all purchasers of the ADRs during the Class Period and propose themselves as Class Representatives and their counsel at Robbins Geller as Class Counsel. Consistent with the CAC (¶331), the proposed "Class" is defined as follows:

> All persons or entities who purchased the American Depositary Receipts of BHP Billiton Limited or BHP Billiton Plc between September 25, 2014 and November 30, 2015, inclusive, and were damaged thereby. Excluded from the Class are: (i) BHP Billiton Limited or BHP Billiton Plc (together, "BHP"); (ii) any directors and officers of BHP during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of BHP; (iv) any firm, trust, corporation or other entity in which BHP has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

As explained below, class certification in this securities action is consistent with precedent from the U.S. Supreme Court and courts in this Circuit, which have expressed a clear preference for certifying such actions. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013); *In re Virtus Inv. Partners, Inc.*, 2017 U.S. Dist. LEXIS 73554, at \*4 (S.D.N.Y. May 15, 2017). Indeed, all of the prerequisites for class certification are met here: numerosity; commonality; typicality; adequacy; common questions predominate over individual ones; and a class action is ideal for adjudicating investors' claims. *See Virtus*, 2017 U.S. Dist. LEXIS 73554, at \*4.

- 2 -

*First*, given the number of ADRs trading during the Class Period, the Class easily consists of more than 40 members and numerosity is satisfied. *Second*, because the Class's claims arise from the same misstatements and omissions and rely on the same theories of liability, questions of law and fact are common to the Class. *Third*, Lead Plaintiffs' claims are typical of the Class's because they share the same factual and legal underpinnings. *Fourth*, Lead Plaintiffs are more than adequate to represent the Class because they are institutional investors that Congress intended to lead cases of this type; their representatives exhibited commendable knowledge of this case and a commitment to the Class; and Lead Counsel, Robbins Geller, is experienced in securities litigation and has thus far ably represented the Class. These issues are largely, if not entirely, undisputed.

Additionally, common questions of law and fact predominate over individual ones, and class treatment is superior to individual adjudication. Issues of materiality, loss causation and reliance all present common questions, with reliance presumed because the ADRs traded in an efficient market – the New York Stock Exchange (the "NYSE") – during the Class Period, as Lead Plaintiffs' financial expert, Dr. Steven Feinstein, has shown. And Dr. Feinstein has demonstrated that damages may be calculated on a class-wide basis, as they typically are in these cases, using a common methodology.

Accordingly, class certification is appropriate in this case, and Lead Plaintiffs respectfully request that the Court grant this motion in its entirety.

## II.    FACTUAL BACKGROUND

BHP and Vale S.A. ("Vale"), a Brazilian miner, each own 50% of Samarco Mineração S.A. ("Samarco"), an iron-ore miner based in Brazil. ¶56. During the Class Period, Samarco had three tailings dams, including the Fundão dam – an upstream dam constructed and continuously raised using the tailings themselves. ¶¶66, 71. Such dams are notoriously dangerous and susceptible to a condition called liquefaction, which may occur when tailings are not allowed to fully dry before they are incorporated into the dam and consequently undermine its structural integrity. ¶¶71-76.

On November 5, 2015, the Fundão dam collapsed, destroying the town of Bento Rodrigues, killing 19 people, and contaminating the surrounding area and waterways for hundreds of miles. ¶¶2, 144, 295.  The catastrophe is regarded as the worst environmental disaster in Brazil's history. ¶¶2, 282.  And yet until the collapse occurred and the media trained its focus on the Fundão dam, BHP investors were unaware that Samarco lacked a viable emergency action plan or that the dam was besieged by structural defects and issues for years.  ¶¶11, 107-21.  Investors were also unaware that Vale used the dam to dispose of tailings from its nearby Alegria mine.  ¶¶8, 101-03, 319(i).

In fact, Samarco's Board of Directors – comprised of four representatives each of BHP and Vale – long considered resettling the communities near the dam because of the danger it posed and frequently discussed tailings storage issues.  ¶¶90-98.  Expanding storage was necessary to account for the 37% increase in iron-ore production resulting from the P4P Project – an increase required to offset the dramatic decline in iron-ore prices by the start of the Class Period.  ¶¶82-85.  The Samarco Board responded by raising the height of the Fundão dam at an unprecedented rate.  ¶¶5, 100, 171.

Notably, BHP's President of Iron Ore, James Wilson, and his predecessor, Marcus Randolph – both members of BHP's governing executive body, the Group Management Committee ("GMC") – were members of Samarco's Board and attended meetings at which these issues were discussed. ¶¶52, 58-59, 64, 90-100.  BHP executives also served on the Samarco Board committees responsible for overseeing Samarco's operations, including the P4P Project.  ¶¶62-63.  And BHP's Chairman, former-defendant Jac Nasser, admitted that BHP reviewed the Pristino Report – which detailed risks, defects, and problems at the Fundão dam – when it was issued, back in October 2013.  ¶¶7, 127-28.

Nevertheless, BHP failed to publicly disclose any of the information it knew regarding the precarious condition of the Fundão dam.  Rather, throughout the Class Period, BHP spoke positively about its focus on safety and risk monitoring and management, to the detriment of ADR investors. ¶¶196-253.

- 4 -

The Class Period begins on September 25, 2014.  On that date, BHP issued its 2014 Form 20-F, in which Nasser extolled BHP's "relentless focus on the health and safety of [its] people and the communities in which [it] operate[s]."  ¶¶198-99.  By then, however, cracks had appeared in the wall of the Fundão dam.  ¶121.  And yet up to and including on September 23, 2015, when BHP issued its 2015 Form 20-F, BHP and former-defendants Nasser and CEO Andrew Mackenzie made similar, if not identical, representations no less than 25 times.  *See BHP*, 276 F. Supp. 3d at 80; ¶¶198-241.

During that time, BHP and these executives also made statements regarding the adequacy and efficacy of its safety and risk management and monitoring protocols.  ¶¶242-53.  For example, in the 2014 Form 20-F, BHP stated: "To understand, manage and, where possible, eliminate the risks in our business, we have appropriate controls in place and provide our people with appropriate training."  ¶242.  In the 2015 Form 20-F, BHP likewise stated that "[i]dentifying and managing fatal and material risk is a critical component of our management approach."  ¶233.

As the CAC alleges, these statements were false and misleading in view of the precarious condition of the Fundão dam – an integral part of Samarco's operations – which remained concealed from investors.  ¶¶6-11, 205.  Investors were also unaware of BHP's failure to adequately manage risks associated with those operations, given the lack of an emergency action plan and disregard for warning alerts from monitoring equipment at the dam.  ¶¶9, 11, 137-43, 251.  Instead, BHP assured investors that it viewed "safety performance as a critical indicator of a business in control."  ¶218.

This carefully-maintained façade shattered when the dam collapsed on November 5, 2015. From then on, previously concealed information emerged about problems afflicting the Fundão dam, exposing the falsity of the Class Period statements.  Indeed, as a Brazilian state prosecutor observed: "No dam bursts by chance."  ¶295.  This news – which ranged from reports of systemic safety issues at Samarco to possible criminal charges in Brazil – caused substantial declines in the trading price of the ADRs from November 6 to 30, 2015, damaging investors.  ¶¶293-314.

This lawsuit, brought on behalf of ADR purchasers during the Class Period, followed.  On June 14, 2016, the Court appointed Lead Plaintiffs to direct the prosecution of this case, designating their counsel, Robbins Geller, as Lead Counsel.  ECF No. 46.  As set forth in their Certifications, Lead Plaintiffs variously purchased ADRs on June 1, July 8 and October 8, 2015, suffering losses of over $470,000.  ECF Nos. 39-1 at 4 & 7, 39-2; *see also* Ex. A (Certifications).

On August 15, 2016, Lead Plaintiffs filed the CAC, which spans 105 pages and contains 355 numbered paragraphs.  ECF No. 53.[2]  Thereafter, BHP and its executives then-named as defendants moved to dismiss the CAC, which the parties briefed and argued.  ECF Nos. 59-74.  On August 29, 2017, the Court decided the motion.  ECF No. 77.

In sustaining securities fraud claims against BHP, the Court held that the CAC adequately alleges "that BHP made actionable misstatements regarding its commitment to safety and its risk management controls, and omissions of facts needed to make these statements not misleading." *BHP*, 276 F. Supp. 3d at 94.  In doing so, the Court had "no trouble" finding "corporate scienter," reasoning that the "[CAC] alleges with particularity facts indicating that the BHP executives who served on Samarco's board" – including Wilson and Randolph, who were charged with the Brazilian equivalent of involuntary manslaughter – "had access to information that revealed the statements and omissions to be misleading." *Id*. at 90-91.

The parties then negotiated a case schedule, memorialized in the October 12, 2017 Joint Rule 26(f) Report, and BHP filed its Answer.  ECF Nos. 82-83.  The Court approved the undisputed parts of the Joint Report on October 16, 2017 (ECF No. 84), and Lead Plaintiffs served their First Set of Requests for Production the following day.  *See* Russello Decl., ¶10.

---

[2]     The CAC includes James A. Crumpley as a named plaintiff because, unlike Lead Plaintiffs, he purchased BBL ADRs, but he is not presently seeking appointment as a Class Representative given that Lead Plaintiffs may represent the entire Class.  *See Hevesi v. Citigroup Inc*., 366 F.3d 70, 82-83 (2d Cir. 2004).  Nevertheless, Mr. Crumpley stands ready and willing to serve as a Class Representative if it should become necessary for him to do so.

Since then, Lead Plaintiffs have served and responded to written discovery, producing almost 56,000 pages in response to BHP's requests; assembled a team of lawyers to prosecute this case; hired and consulted with counsel in Australia and Brazil; pursued third-party discovery; and engaged Dr. Feinstein to evaluate the elements of class certification and provide an expert opinion on market efficiency.  *Id.*, ¶11; *see also* Ex. B (March 14, 2018 Feinstein Report); Ex. C.  BHP deposed Dr. Feinstein on April 24, 2018; Lead Counsel defended the deposition.[3]  *See* Russello Decl., ¶12; Ex. D.

Additionally, Lead Plaintiffs each produced members of their Board of Managers to testify as Rule 30(b)(6) representatives in May 2018: Catina Williams for City of Birmingham Retirement and Relief System ("Relief System"); and Dexter Cunningham for City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Supplemental System").  *See* Russello Decl., ¶14.  As shown below, they testified knowledgeably about: the claims at issue, including the Fundão dam collapse; the Class Period; Lead Plaintiffs' role, responsibilities, and involvement in this case and their commitment and obligations to the Class; and Lead Counsel's terms of engagement and work.

Accordingly, based on the above and as further shown below, all of the prerequisites for class certification are met here.  The claims arise out of the same facts and circumstances and involve the same legal principles, Class members were injured by the same conduct, and Lead Plaintiffs have assiduously represented the interests of the Class and have pledged to continue to do so.  Further, BHP has admitted that the Class is sufficiently numerous and cannot credibly deny that common issues predominate or that a class action is superior to individual adjudications.

---

[3]     On June 21, 2018, Lead Plaintiffs, through Lead Counsel, deposed BHP's expert, Dr. René M. Stulz, who submitted a report on May 18, 2018 in response to Dr. Feinstein's opening report.  *See* Russello Decl., ¶17.  Dr. Feinstein intends to submit a rebuttal report confirming that his opinions on market efficiency remain unchanged, notwithstanding Dr. Stulz's report and testimony.  *Id.*  Because BHP has not yet opposed this motion but has the burden of rebutting the fraud-on-the-market presumption of reliance for securities that trade in efficient markets, Lead Plaintiffs reserve the right to file Dr. Feinstein's forthcoming rebuttal report, and address Dr. Stulz's positions, should the need arise.  Separately, Lead Plaintiffs have filed a motion requesting the Court to exclude the report and opinions of Dr. Stulz for failing to satisfy even the most basic requirements for the admissibility of expert evidence.

III.     **ARGUMENT**[4]

A.      **The Class Certification Standards**

For decades, "the Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," especially "in securities cases." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993); *see also Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972) (endorsing "the admonition of liberality toward demands for class suit status in securities litigation").  In fact, the Supreme Court views "'private securities litigation [a]s an indispensable tool with which defrauded investors can recover their losses . . . .'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)).

To obtain class certification, a plaintiff need only show by a preponderance of the evidence that the proposed class meets all of the requirements of Rule 23(a) and one subsection of Rule 23(b). *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).  Rule 23(a)'s prerequisites are "numerosity, commonality, typicality, and adequacy of representation," while Rule 23(b)(3)  – the subsection under which certification is sought here – requires that common issues predominate over individual ones "and that a class action is superior to other available methods" of adjudication. *Amgen*, 568 U.S. at 460.

In evaluating a class certification motion, a court will avoid merits-based issues unrelated to Rule 23's requirements and consider only those facts relevant to its analysis.  *Id.* at 465-66 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries"); *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (same).

---

[4]      All citations and internal quotation marks are omitted unless otherwise indicated.

**B.      Rule 23(a)'s Requirements Are Satisfied**

**1.      The Class Consists of Hundreds, if Not Thousands, of Members**

Where the individual members of a class are so numerous as to render joinder impracticable – that is, difficult or inconvenient – numerosity is established.  *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2018 U.S. Dist. LEXIS 33640, at *82 (S.D.N.Y. Feb. 28, 2018) (Buchwald, J.) (joinder need not be impossible).  In fact, "'numerosity is presumed at a level of 40 members.'" *Virtus*, 2017 U.S. Dist. LEXIS 73554, at *5 (quoting *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)); *see also Libor*, 2018 U.S. Dist. LEXIS 33640, at *82 (same).

Here, the CAC alleges that "there are hundreds, if not thousands, of members in the proposed Class."  ¶332.  Indeed, BHP admits that during the Class Period: "at least 100 entities or persons purchased" the ADRs; tens of millions of ADRs were outstanding; and the average weekly trading volume of BHP Ltd. ADRs ("BHP ADRs") and BHP Plc ADRs ("BBL ADRs") was approximately 14.7 million and 6.3 million, respectively. Ex. C, Nos. 3-8, 15-18.  These admissions corroborate Dr. Feinstein's findings (Ex. B, ¶¶55, 97), which is unsurprising, given that the ADRs publicly trade on the NYSE – the largest equities-based exchange in the world. *See* Ex. C, Nos. 69-70, 72-73.

In securities cases involving publicly-traded companies, numerosity "'may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *Facebook*, 312 F.R.D. at 341 (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007)).  Here, the uncontroverted evidence demonstrates that millions of ADRs were outstanding and traded during the Class Period, and BHP admits that the number of purchasers far exceeds the presumptive threshold for numerosity. *Cf. Libor*, 2018 U.S. Dist. LEXIS 33640, at *344 (finding numerosity even in absence of evidence, underscoring minimal requirement for numerosity).

Under these circumstances, joinder of all Class members would be difficult and inconvenient, while certifying the Class would undoubtedly promote efficiency.  Thus, numerosity is established.

## 2.   Common Questions of Law and Fact Exist

"'[W]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Libor*, 2018 U.S. Dist. LEXIS 33640, at *83 (quoting *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015)).  In a securities class action, commonality exists "where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages." *Virtus*, 2017 U.S. Dist. LEXIS 73554, at *6.  In such a case, resolving these questions for all class members will require the same proof and "generate common *answers* apt to drive the resolution of the litigation." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Nevertheless, "[t]he existence of a single common question . . . establish[es] commonality," *Libor*, 2018 U.S. Dist. LEXIS 33640, at *86, and "minor variations in the class members' positions will not . . . defeat certification." *Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000).  Thus, class members need not assert "identical claims" nor must "the circumstances of their securities purchase[s] be identical." *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 156 (S.D.N.Y. 2012) (observing that commonality is applied "permissively" in securities class actions).

"Common questions of law and fact are present where, as here, the alleged fraud involves material misrepresentations and omissions . . . ." *Id*.  These questions include whether BHP and its executives "misrepresented material facts about [its] business and operations," "whether the trading price of the ADRs was artificially inflated during the Class Period" and "to what extent the members of the Class have sustained damages and the proper measure of damages." ¶335(b)-(d).  Moreover, these questions require the same proof for all Class members and their answers will surely drive the resolution of the Class's claims. *See, e.g.*, *Vivendi*, 242 F.R.D. at 84 (similar allegations established commonality); *see also Libor*, 2018 U.S. Dist. LEXIS 33640, at *345 (uniform misrepresentations presented common question).  As a result, commonality is established.

### 3.   Lead Plaintiffs' Claims Are Typical of The Class's

Typicality exists if "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *Libor*, 2018 U.S. Dist. LEXIS 33640, at *83 (quoting *Flag*, 574 F.3d at 35).  The purpose of this requirement is to ensure that the class representatives are incentivized to prove the claims as if prosecuting them on an individual basis.  *Ligon v. City of New York*, 288 F.R.D. 72, 79 (S.D.N.Y. 2013).  The question is "whether 'the claims and defenses of the representative parties are typical of the claims or defenses of the class.'"  *Facebook*, 312 F.R.D. at 343 (quoting Fed. R. Civ. P. 23(a)(3)).

"In a securities class action . . . the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'"  *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) (quoting *Vivendi*, 242 F.R.D. at 85).  In this case, the surviving Section 10(b) claims arise out of false and misleading statements and omissions regarding BHP's "commitment to safety" and "risk management controls."  *See BHP*, 276 F. Supp. 3d at 94 (describing upheld claims).  And the evidence necessary to prove these claims is not only uniform, but also identical.  Indeed, the claims alleged, by their very nature, arise out of *BHP's misconduct*.

Furthermore, Lead Plaintiffs, like all other proposed Class members, purchased ADRs during the Class Period *after* BHP and its executives disseminated certain of the actionable statements and omissions at issue.  *See* Ex. A; *see also* ¶¶24, 293-94, 340, 350.  Thus, Lead Plaintiffs, also like all other proposed Class members, purchased ADRs at artificially inflated prices and suffered losses when the truth emerged, between November 6 and 30, 2015.  ¶¶293-314 (chronicling revelation of information resulting in decline in trading price of ADRs).

Accordingly, because the same course of conduct injured Lead Plaintiffs and all other Class members, and the evidence required to prove all such claims will not differ, Lead Plaintiffs' claims are typical of the Class's.  *See, e.g.*, *Bank of Am.*, 281 F.R.D. at 139 (finding typicality).

### 4.  Lead Plaintiffs Will Fairly and Adequately Represent the Class

Adequacy exists if a class representative does not have interests "antagonistic" to those of the proposed class and its chosen counsel is "qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  This requirement is intended to uncover and consider conflicts of interest between the proposed class representatives "'and the class they seek to represent.'"  *Bank of Am.*, 281 F.R.D. at 140 (quoting *Flag*, 574 F.3d at 35).  Any conflict, however, "must be 'genuine'" to preclude certification.  *Bank of Am.*, 281 F.R.D. at 140 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)); *accord Facebook*, 312 F.R.D. at 344 (noting the conflict "must be fundamental").

Here, "[a]s discussed with respect to the typicality requirement, the interests of the proposed [C]lass [R]epresentatives are not antagonistic to the interests of the proposed [C]lass members." *See Bank of Am.*, 281 F.R.D. at 140.  Indeed, Lead Plaintiffs and other Class members "share a common interest in showing that [BHP] violated . . . securities laws" and "wish to obtain the highest possible recovery" for the claims alleged.  *See Drexel*, 960 F.2d at 291.  In fact, Lead Plaintiffs' Rule 30(b)(6) representatives – Ms. Williams and Mr. Cunningham – expressed an admirable understanding of Lead Plaintiffs' responsibilities to the Class and pledged to assiduously discharge them.

Ms. Williams, for example, testified that the Relief System represents similarly-situated ADR purchasers who sustained losses, and that its responsibility is to lead efforts to recover for the Class – even if BHP offers to settle its claim on an individual basis.  *See* Ex. E, 149:16-150:24[5] (testifying as to losses and to representing "others in the same situation"); 151:20-152:3 (testifying to supervising Lead Counsel); 154:25-155:13 (testifying to "seeking damages because of the losses"); 196:4-14 (testifying to protecting the Class's interests).

---

[5]  Citations to deposition transcripts conform to the following format: [page]:[line]-[page]:[line].

Mr. Cunningham testified similarly on behalf of the Supplemental System, indicating that it will best represent investors because of its own losses and that its duty as a Class Representative is to ensure that investors "are made whole," directly and by supervising counsel.  *See* Ex. F, 107:13-108:22 ("[W]e felt we best represented those investors who lost funds . . . because of the losses that we incurred because of the improprieties."); 118:23-119:9 (testifying as to making investors whole); 132:10-133:7 (same).  And when asked to describe this case, he testified: "We're saying that BHP intentionally misled by making these statements; and, in turn, once the truth came out concerning the issues with the dam as well as the dam collapse, the stock plunged."  *Id.*, 196:4-12.

Since its appointment as Lead Counsel, Robbins Geller has also diligently represented the interests of the proposed Class.  Indeed, Robbins Geller investigated and prepared the CAC, which the Court characterized as "detailed and well-sourced" in sustaining Section 10(b) claims against BHP arising out of misstatements and omissions concerning its focus on safety and its risk controls. *See BHP*, 276 F. Supp. 3d at 81.  Since then, Robbins Geller has continued to advance and protect the Class's interests, further investigating the events preceding the dam collapse, here and abroad; serving and responding to discovery requests, including gathering and producing documents and pursuing third-party discovery, here and abroad; analyzing the discovery obtained; consulting Dr. Feinstein, mining consultants, and legal consultants in Australia and Brazil; communicating with Lead Plaintiffs; and directing the prosecution of this litigation under Lead Plaintiffs' supervision.

Moreover, as its firm résumé confirms, Robbins Geller is experienced in securities litigation, has prosecuted myriad complex class actions, and has achieved substantial – and even record-setting – recoveries. Ex. F; Russello Decl., ¶19.  Indeed, Robbins Geller has successfully prosecuted many cases in this District, including: *In re Intercept Pharms., Inc. Sec. Litig.*, No. 14-cv-01123-NRB (S.D.N.Y.) ($55 million settlement in 2016); and *Landmen Partners, Inc. v. Blackstone Grp. L.P.*, No. 08-cv-03601-HB-FM (S.D.N.Y.) ($85 million settlement in 2013).  *See* Russello Decl., ¶20.

Accordingly, because Lead Plaintiffs' interests are aligned with the Class's and they have pledged to continue to advance and protect those interests, Lead Plaintiffs' adequacy is established. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015) (appointing plaintiffs who "actively supervised and monitored the progress of this litigation, and will continue to actively participate in its prosecution"). Additionally, because Robbins Geller has ably prosecuted this case as Lead Counsel and is committed to continuing to do so, its adequacy is likewise established and its appointment as Class Counsel under Rule 23(g) is appropriate. *See id.* ("Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits.").

### C.      Rule 23(b)(3)'s Requirements Are Satisfied

Rule 23(b)(3) requires a proposed class representative to establish that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Amgen*, 568 U.S. at 460. These requirements are also readily satisfied here.

#### 1.      Common Questions of Law and Fact Predominate

"'Class-wide issues predominate if [their] resolution . . . can be achieved through generalized proof, and . . . [they] are more substantial than the issues subject only to individualized proof.'" *In re Pfizer Inc. Secs. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)); *accord Amgen*, 568 U.S. at 469 (issues must *predominate*).

Materiality and loss causation are issues that predominate because they are subject to uniform proof. *Amgen*, 568 U.S. at 461-62 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811-12 (2011) (loss causation). Reliance also predominates where, as here, it is predicated on the fraud-on-the-market presumption – which obviates the need to show individual reliance if the security at issue trades in an efficient market. *See Pfizer*, 282 F.R.D. at 52.

Additionally, reliance is presumed here because the claims are based on factual omissions, given that BHP failed to disclose information regarding the precarious condition of the Fundão dam. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).  And the issue of damages predominates because they may be calculated on a class-wide basis using a methodology tailored to this litigation, which is all that is required at this stage.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017).

Accordingly, as explained in further detail below, reliance and damages are common issues – like materiality and loss causation – that predominate over individual ones, because they apply to all putative Class members in precisely the same way.

### a. Reliance is Presumed Under the Fraud-On-The-Market Theory Because the ADRs Traded in Efficient Markets

Under the fraud-on-the-market theory, "'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).  Thus, the purchaser of a security that trades in an efficient market is presumed to have relied on public information and representations – including public *misrepresentations* – when making the purchase.  *Halliburton II*, 134 S. Ct. at 2408.

To invoke the fraud-on-the-market presumption, a security must trade in an efficient market. *Id.*[6]  While the Second Circuit has "declined to adopt a particular test for market efficiency," it has recognized that "district courts in this and other Circuits regularly consider" the following factors:

---

[6]     To invoke the presumption, its proponent must also show that the alleged misrepresentations concerned material information and "were publicly known," and that the purchase occurred after the misrepresentation was made but before the revelation of the truth.  *Halliburton II*, 134 S. Ct. at 2408.  While materiality need not be established at this juncture, this Court extensively analyzed materiality at the motion-to-dismiss stage and concluded that the misstatements concern material information.  *See BHP*, 276 F. Supp. 3d at 79-80.  Moreover, as their Certifications demonstrate, Lead Plaintiffs purchased ADRs after the issuance of certain misstatements and before the revelation of the truth, as alleged in the CAC. *See* ECF Nos. 39-1 at 4 & 7, 39-2 (showing purchases on June 1, July 8 and October 8, 2015); *see also* Ex. A (same).

> (1) the average weekly trading volume of the [stock], (2) the number of securities analysts following and reporting on [it], (3) the extent to which market makers traded in the [stock], (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the [stock's] price[].

*Barclays*, 875 F.3d at 94 (citing factors from *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).  As the Second Circuit further recognizes, "courts often consider" the following factors also: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')."  *Barclays*, 875 F.3d at 94-95 (citing factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).

Notwithstanding the Second Circuit's implicit endorsement of these factors, it has advocated "a holistic analysis based on the totality of the evidence presented" and recognized "the potential probative value of indirect evidence of market efficiency."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277-78 (2d Cir. 2017).  In fact, the Second Circuit has twice rejected undue emphasis on the fifth *Cammer* factor – a factor said to provide a "'direct' measure of [market] efficiency[.]"  *See Barclays*, 875 F.3d at 89, 97-98; *accord Petrobras*, 862 F.3d at 277-78.  Indeed, "[d]irect evidence . . . may be more critical . . . in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market."  *Barclays*, 875 F.3d at 98.

Here, all of the *Cammer* and *Krogman* factors overwhelmingly support market efficiency – including the fifth *Cammer* factor, which is arguably unnecessary where, as here, all of the indirect measures of efficiency are satisfied.[7]  *See* Ex. B (Feinstein Report), ¶126 ("[T]he fact that the BHP Billiton ADRs exceeded by wide margins the first four *Cammer* and [all of the] *Krogman* factors makes it more likely than not that the subject securities traded in efficient markets.").

---

[7]     Additionally, BHP was the subject of extensive media coverage – over 4,700 articles – during the Class Period, which also facilitated the incorporation of public information into the trading price of the ADRs and, consequently, promoted market efficiency.  Ex. B, ¶¶64-66, 101-02.  Consideration of such coverage falls within the "holistic analysis" the Second Circuit has endorsed, as noted above.  *See Petrobras*, 862 F.3d at 277; *cf. In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *22 (S.D.N.Y. Sept. 29, 2015) (noting "additional efficiency considerations").

### (1) The ADRs Actively Traded on the NYSE, Which is Widely Regarded as an Efficient Market

Under the ticker symbols "BHP" and "BBL," the ADRs "traded regularly and actively" on the NYSE during the Class Period. Ex. B, ¶¶28, 54, 96. As BHP admits, tens of millions of ADRs were outstanding, with average weekly trading volumes for BHP and BBL ADRs of 14.7 million and 6.3 million, respectively (Ex. C, Nos. 3-8, 15-18) – figures confirming Dr. Feinstein's findings. Ex. B, ¶¶55, 97. These metrics reflect average weekly trading volumes of 15.6% and 22.7% of total outstanding BHP and BBL ADRs, respectively. *Id.*, ¶¶55, 97. And, on average, 2.9 million and 1.3 million BHP and BBL ADRs "changed hands daily." *Id.*, ¶¶54, 96.

"Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013). The trading volume of the ADRs was well above this threshold. Ex. B, ¶¶55, 97; *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *18 (6.5% turnover sufficient). And the ADRs traded on the NYSE – itself "a strong indication" of market efficiency. *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *22; *accord Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is a good indicator of efficiency"), *aff'd*, *Barclays*, 875 F.3d at 79; *cf.* Ex. C, No. 73 (admitting NYSE is largest equities-based exchange).

### (2) Numerous Securities Analysts Followed the ADRs and Issued Reports on BHP

During the Class Period, BHP was subject to extensive analyst coverage. By BHP's count, 39 securities analyst firms "issued reports" regarding BHP. Ex. C, No. 78. Likewise, Dr. Feinstein obtained reports from 19 firms, noting representatives from an additional nine firms also participated in conference calls. Ex. B, ¶¶58-60, 99. As Dr. Feinstein observed, these firms "are well-respected names in the world of analyst coverage." Ex. D, 101:15-102:23. Such wide coverage "promote[s] market efficiency." Ex. B, ¶¶57, 99.

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company . . . ." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). Here, coverage was extensive and frequent, with 99 *individuals* working for analyst firms tied to covering BHP during the Class Period. *See* Ex. H, ¶13(a)-(x).

### (3) Market-Making Activity Promoted the Liquidity of the ADRs and Institutional Investing

"Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level."[8] *Winstar*, 290 F.R.D. at 446. "Securities on the NYSE are traded under the supervision of a lead market maker" "responsible for maintaining a fair and orderly market" and subject to NASDAQ market-making activity. Ex. B, ¶¶69, 71, 104. From October 2014 through November 2015, there were at least 129 market makers for BHP ADRs and 88 market makers for BBL ADRs. *Id.*, ¶¶72, 105; Ex. C, Nos. 9-10 (admitting to number of market makers). The involvement of these market makers supports market efficiency. *See Winstar*, 290 F.R.D. at 447 (six market markers sufficient).

Additionally, the high degree of institutional ownership – a hallmark of liquid securities – also reflects market efficiency. Ownership by institutional investors suggests that they could "easily buy and sell" a security and "likely acted as arbitrageurs and facilitated the efficiency of the market." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Notably, 710 major institutions – those with investment discretion over $100 million in assets or more – owned BHP ADRs during the Class Period, while 243 such institutions owned BBL ADRs. Ex. B, ¶¶63, 100.

---

[8] "The SEC defines a market maker as a dealer who either (1) regularly publishes bid and offer quotations, (2) furnishes these quotations upon request, and (3) is ready, willing and able to transact in reasonable quantities at quoted prices." *Winstar*, 290 F.R.D. at 446-47 (quoting 17 C.F.R. § 240.15c3-1(c)(8)); *accord* Ex. B, ¶¶67.

### (4) BHP Was Eligible to File a Form F-3 During the Class Period and Did So

BHP admits it was "eligible to file a Form F-3 with the SEC" during the Class Period (Ex. C, Nos. 87-88), and it did so. Ex. B, ¶¶82, 111. Form F-3 registration for foreign private issuers is the "functional equivalent" of Form S-3 registration for domestic issuers. *Billhofer*, 281 F.R.D. at 154; *accord* Ex. B, ¶74. "Forms S-3 and F-3 recognize the applicability of the efficient market theory to [eligible filers]," "whose corporate information" is "constantly digested and synthesized by financial analysts" and "broadly disseminated on a timely basis by the financial press and other participants in the marketplace." *See Shelf Registration*, Release No. 33-6499 (Nov. 17, 1983) [48 FR 52889] (Ex. I at 6); *accord Cammer*, 711 F. Supp. at 1284. The ease with which BHP "issue[d] new securities" is another factor that militates in favor of market efficiency. *See Winstar*, 290 F.R.D. at 447.

### (5) The Trading Price of the ADRs Reacted to News, Evidencing a Cause-and-Effect Relationship

In the presence of other indicia of market efficiency (as here), establishing the fifth *Cammer* factor – which tests the reaction of a security's price to company-specific news – is less important. As the Second Circuit recently confirmed, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Barclays*, 875 F.3d at 97. Indeed, in cases in which the fifth factor is *essential*, indirect indicia of market efficiency are absent. "Direct evidence of an efficient market may be more critical, for example, in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market." *Id.* at 98 (upholding a "decision not to rely on direct evidence of price impact").

Here, the first four *Cammer* factors – and all *Krogman* factors, discussed below – support market efficiency, obviating the need to satisfy the fifth factor. *See* Ex. B, ¶216. Nevertheless, Dr. Feinstein's event study analysis provides compelling evidence of a cause-and-effect relationship between the dissemination of news about BHP and the movement in the trading price of the ADRs.

"'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'"  *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).  To analyze this correlation, the event study considers dates on which *news* is disseminated about the company and isolates the *movement* in the trading price that corresponds to such company-specific news.  *See Barclays*, 310 F.R.D. at 87-88 (describing this as the "standard event study methodology").

"[I]deal candidate events for inclusion in a market efficiency event study are events on which company-specific information was released that is new, unexpected, and may . . . reasonably be expected to elicit a stock price reaction over the threshold for statistical significance."  Ex. B, ¶134.  The "residual return" is "[t]he portion of a security's price change" attributable to company-specific news, and a statistically significant return excludes the likelihood that extraneous factors – such as "market or sector factors" or conditions – caused the price movement.  *Id.*, ¶¶129-30.

"To identify potential event dates, [Dr. Feinstein] reviewed all BHP news and analyst reports during the Class Period, focusing on . . . quarterly operational reviews and earnings announcements."  *Id.*, ¶137.  Of "five quarterly operational reviews and two earnings announcements" over seven days (*id.*, ¶138), Dr. Feinstein selected four dates: February 24, 2015; April 22, 2015; July 22, 2015; and August 25, 2015.  *Id.*, ¶¶140-45.  He selected those dates after "review[ing] news media and analyst reports published around the seven dates" to isolate unexpected, "new valuation-relevant information that should reasonably be expected" to statistically impact the ADRs' trading prices.  *Id.*, ¶¶139-40.

Accordingly, Dr. Feinstein employed an accepted methodology to select event dates.  *See In re Groupon Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27334, at *21 (N.D. Ill. Mar. 5, 2015) ("Dr. Feinstein selected only unexpected, earnings related news days as event days"); *cf.* Ex. C, No. 95 (admitting "U.S. federal courts have found Dr. Feinstein qualified to opine on market efficiency").

"Dr. Feinstein then took the resulting changes in [the ADRs'] price[s] and ran a regression analysis to isolate the changes in [the] price[s] as compared to the market as a whole," as well as the U.S. stock market and mining sector, using three indices.  *See Schleicher v. Wendt*, 2009 U.S. Dist. LEXIS 24810, at *15 (S.D. Ind. Mar. 20, 2009); *see also* Ex. B, ¶¶147-56.  Consistent with accepted practice, he used dummy variables for all seven operational/earnings announcements "to control for potentially atypical observations in the regression estimation period."  *Id*., ¶¶158-59; *see Groupon*, 2015 U.S. Dist. LEXIS 27334, at *27 (endorsing Dr. Feinstein's similar use of dummy variables).

Dr. Feinstein also conducted a *t*-test to determine whether the residual return of the ADRs was statistically significant for the *four* selected dates.  Ex. B, ¶164.  "Statistical significance means that the event return after controlling for [market and sector effects, as reflected in the indices] . . . was of such magnitude that it cannot reasonably be attributed to random volatility, but alternatively must have been caused by company-specific information."  *Id.*  The results of these analyses follow:[9]

| | BHP ADR | | | BBL ADR | | |
|---|---|---|---|---|---|---|
| | **return** | ***t*-stat** | **confidence** | **return** | ***t*-stat** | **confidence** |
| February 24, 2015 | 4.62% | 3.51 | 99% | 5.51% | 3.83 | 99% |
| April 22, 2015 | 3.36% | 2.55 | 95% | 2.97% | 2.07 | 95% |
| July 22, 2015 | -3.36% | -2.76 | 99% | -3.37% | -2.34 | 95% |
| August 25, 2015 | 3.07% | 2.33 | 95% | 3.00% | 2.09 | 95% |

Finally, Dr. Feinstein ran collective tests – the *F-Test* and *Ansari-Bradley Test* – to determine whether ADR price movements were greater among *all seven* operational/earnings announcements than "lesser or non-news days," which "would establish that there is a cause and effect relationship between the flow of information and ADR price movements . . . ."  *Id*., ¶¶187-90.  These tests show price movements at the 95% confidence level, suggesting overwhelmingly greater price movement collectively on news, as opposed to non-news, days.  *Id*., ¶¶194-203.

---

[9]    For the four selected event dates, the chart displays the residual return, *t*-stat, and confidence level.  *See* Ex. B, ¶¶167-85 & Exs. 7a (BHP ADR), 7b (BBL ADR).  A confidence level of 95% reflects a less-than 5% chance the residual return resulted from random volatility; a confidence level of 99% reflects a less-than 1% chance.  *Id*., ¶164 n.80.

These tests – which evaluate "collectively whether the [price of a security] generally moves more on days with greater information flow than on more typical days with less news" (Ex. B, ¶187) – are also widely applied and accepted. *See, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 2018 U.S. Dist. LEXIS 97338, at \*23-24 (D. Md. June 8, 2018) (noting that "experts routinely use, and courts accept, collective tests on the earnings and guidance dates").

### (6) The *Krogman* Factors Also Support a Finding of Market Efficiency

All three *Krogman* factors – market capitalization, bid-ask spread, and public float – likewise support a finding of market efficiency for the ADRs. *See* Ex. B, ¶¶84-94, 113-22.

*First*, "BHP's market capitalization placed it among . . . the largest companies in the world." *Id.*, ¶78. Viewed separately, BHP Ltd.'s market capitalization averaged $68.8 billion during the Class Period ($4.3 billion for BHP ADRs), while BHP Plc's market capitalization averaged $42.6 billion ($1.1 billion for BBL ADRs). *Id.*, ¶¶85-86, 114-15. "[S]izeable market capitalizations . . . are evidence of efficiency . . . ." *Id.*, ¶¶87, 116. A company with a large market capitalization is likely to attract more investors and interest, so the trading market for its securities is more likely to be efficient. *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 94 (S.D.N.Y. 2009) ("*IPO*").

*Second*, the bid-ask spread for the ADRs – the average difference between offers to buy and sell the ADRs, expressed as a percentage – was exceedingly narrow, which means it was inexpensive to initiate and exit positions in BHP during the Class Period. Ex. B, ¶¶91-94, 119-22; *see also IPO*, 260 F.R.D. at 94 ("[A] small bid-ask spread indicate[s] that trading in the stock [i]s inexpensive, suggesting efficiency."). The average bid-ask spread for *both* ADRs in the Class Period was 0.02% ($0.01 per ADR), "well below the typical bid-ask spreads exhibited by other publicly-traded stocks in the U.S." Ex. B, ¶¶92-94, 120-22; *see also JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at \*21 (bid-ask spread of 0.02% sufficient).

*Third*, the public float – the amount of ADRs held by *non*-insiders and available for trading – was immense.  During the Class Period, the average float was $4.3 billion for BHP ADRs and $1.1 billion for BBL ADRs.  Ex. B, ¶¶79, 108.  Further, an average of 95.3 million BHP ADRs and 27.8 million BBL ADRs were outstanding and available for trading, such that all ADRs were in the float.  *Id*., ¶¶88, 117.  These metrics are also strong indicia of market efficiency.  *See JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at \*22 (float was 99% of shares outstanding); *Billhofer*, 281 F.R.D. at 154 ("public float exceeded $286 million" and represented over 99.4% of outstanding ADRs).

> **b.    Reliance is Also Established Under *Affiliated Ute* Because Certain Aspects of the Claims Are Based on Omissions**

Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  *Affiliated Ute*, 406 U.S. at 153; *see also Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (presuming reliance where "defendants omitted their own *quid pro quo* arrangements in addition to deliberately misrepresenting their opinions"); *accord W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 2018 U.S. Dist. LEXIS 14744, at \*18 (D. Minn. Jan. 30, 2018) (presuming reliance where a company did not disclose that it paid writers to author articles that "ma[d]e false representations" about the efficacy of drugs).

The claims at issue are predicated in large part on BHP's failure to disclose information on the precarious condition of the Fundão dam, which rendered false and misleading its safety and risk management statements.  *See BHP*, 276 F. Supp. 3d at 78 (referencing "omission-based theories").  As this Court held in partially sustaining these claims, the CAC "adequately allege[s] that BHP acted with scienter *in omitting to disclose the material risks* relating to the Fundão dam and Samarco's operations . . . ."  *Id*. at 92 (emphasis added).  Indeed, before the November 5, 2015 collapse, BHP never – *not once* – mentioned the Fundão dam in its public statements, including those identified in the CAC.

In these circumstances, a showing of reliance on the omissions is unnecessary, even if the CAC *also* alleges that BHP disseminated affirmative misstatements.[10]  *See Fogarazzo*, 232 F.R.D. at 186 ("[T]he theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information."); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014) (noting that the "presumption applies to cases 'involving *primarily* a failure to disclose,' which is not the same as cases involving exclusively a failure to disclose," quoting *Affiliated Ute*, 406 U.S. at 153).

### c.    As Dr. Feinstein Has Shown, Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology

As in most securities class actions, damages are subject to calculation on a class-wide basis using a common methodology.  *First*, valuation tools, including an event study, are used to assess whether corrective disclosures caused ADR price declines.  Ex. B, ¶212.  *Second*, an inflation ribbon is used to quantify the artificial inflation in the price resulting from the misstatements or omissions.  *Id.*, ¶213.  *Third*, damages are calculated for each Class member as the amount of inflation between the purchase and sale of ADRs.  *Id.*, ¶214.  Nothing more is required.[11]  *See JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *24 (accepting Dr. Feinstein's "propos[al] to calculate classwide, per-share damages through an event study").  Thus, predominance also exists for this issue.

---

[10]     Nor does *Barclays* mandate a different result.  In *Barclays*, the alleged omissions were "simply the inverse of the . . . misrepresentation[s]," which "exacerbated the misleading nature of the affirmative misstatements."  875 F.3d at 96.  By contrast, here, omissions regarding the issues at the Fundão dam – while admittedly implicating safety and risk – involved independently material information BHP was obligated to disclose.  *See, e.g.*, *Virtus*, 2017 U.S. Dist. LEXIS 73554, at *16 (examining "two sets of misleading statements" and finding omissions related to one set gave rise to the *Affiliated Ute* presumption); *Basile v. Valeant Pharm. Int'l, Inc*., 2017 U.S. Dist. LEXIS 37400, at *40 (C.D. Cal. Mar. 15, 2017) ("This is a case involving a duty to disclose – accordingly *Affiliated Ute* applies.").

[11]     In fact, this showing arguably exceeds what is required, given that "*Comcast* [*Corp. v. Behrend*, 569 U.S. 27, 35 (2013)] does not mandate . . . that damages are capable of measurement on a classwide basis."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015).  "Instead, *Comcast* merely requires that 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"  *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *23-24 (quoting *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 82 (2d Cir. 2015)).

### 2.      A Class Action Is Superior to Alternate Methods of Adjudication

"In general, securities suits . . . easily satisfy the superiority requirement . . . ." *JPMorgan*,

2015 U.S. Dist. LEXIS 132181, at *25.  This case is no different.  The proposed Class consists of

"dozens if not more potential claimants who are asserting claims based on predominantly common

issues" and "[a]djudicating individual claims would be a significant waste of judicial resources."

*Billhofer*, 281 F.R.D. at 164.  Moreover, the Class's claims are best protected and advanced here,

given Lead Plaintiffs' and Lead Counsel's commitment to prosecute this litigation – and the absence

of any *other* case involving claims by purchasers of the ADRs, which evidences a lack of interest in

initiating or controlling separate actions.  *See Pfizer*, 282 F.R.D. at 53.

Allowing this case to proceed as a class action would also eliminate "the risk of inconsistent

judgments" and conserve judicial resources, while enabling the Class to benefit from "the familiarity

of the Southern District of New York with securities law."  *See Public Emples. Ret. Sys. of Miss. v.

Goldman Sachs Grp., Inc.*, 280 F.R.D 130, 141 (S.D.N.Y. 2012) (noting that a "second individual

action" filed "close to three years" after the putative class action did not require a different result).

Fact discovery is also well underway, and BHP and others have produced hundreds of thousands of

pages of responsive materials, all to the benefit of the Class.  Thus, a class action is clearly superior

to a multiplicity of individual suits alleging identical claims.

## IV.      CONCLUSION

As shown herein, Lead Plaintiffs have satisfied the requirements for class certification by a

preponderance of the evidence, if not more so.  Accordingly, Lead Plaintiffs respectfully request that

the Court: (i) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (ii) appoint Lead

Plaintiffs as Class Representatives; and (iii) designate Robbins Geller as Class Counsel pursuant to

Rule 23(g); and (iv) grant such other and further relief as the Court deems just and proper.

DATED:  June 29, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO
ALAN I. ELLMAN
MICHAEL G. CAPECI

_/s/ Joseph Russello_
JOSEPH RUSSELLO

58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
aellman@rgrdlaw.com
mcapeci@rgrdlaw.com

_Lead Counsel and Proposed Class Counsel_

POMERANTZ LLP
JEREMY A. LIEBERMAN
BRENDA SZYDLO
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
bszydlo@pomlaw.com

_Additional Counsel for Plaintiffs_

## CERTIFICATE OF SERVICE

I, Joseph Russello, hereby certify that on June 29, 2018, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.  I further certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 29, 2018 at Melville, New York.

*/s/ Joseph Russello*
JOSEPH RUSSELLO
